# Staunton.

FUDGE V. PAYNE.

SEPTEMBER 17th, 1889.

1. WRITTEN INSTRUMENTS — *Reformation—Mistakes—Parol evidence—Proof.*—It is settled law that in suits to reform written instruments on the ground of mutual mistake, parol evidence is always admissible to establish the fact of a mistake, and in what it consisted, and to show how the writing should be corrected in order to conform it to the agreement which the parties actually made. But the mistake must be proved beyond a reasonable doubt.
2. IDEM—*Case at bar.*—In this case, upon the evidence in the record: *held,* there is no proof of any mistake.
3. CHANCERY PRACTICE—*Amendment of bill.*—Where demurrer has been sustained to a bill, and the bill amended, the plaintiff waives his right to appeal on that ground.

Appeal from two decrees of circuit court of Alleghany county, rendered August 28, 1886, and March 30, 1887, in the chancery cause wherein Sarah Ann Payne and John H. Oliver are complainants and Joseph T. Fudge, George T. McClintic, and James C. Kincaid are defendants. The object of the suit was to reform a deed whereby the defendant Kincaid conveyed certain lands to those under whom the complainants claimed on the ground of a mutual mistake so as to make it conform to the intention of the parties. The circuit court reformed the deed according to the prayer of the bill, and the defendants appealed. Opinion states the case.

*E. Pendleton,* for the appellants.

*R. L. Parrish,* for the appellees.

LACY, J., delivered the opinion of the court.

On the 20th of July, 1869, John L. Peyton sold to James C. Kincaid two thousand acres of land in the Falling Spring Valley, in Alleghany county, at the price of $12,000—$4,000 to be paid in cash and the residue on long credits. On the 4th day of August, 1869, the said James C. Kincaid sold to the appellees, Payne and Oliver, a part of this land for $2,000, this being described in the contract as "lying and being in the Falling Spring Valley, county of Alleghany, containing five hundred and seventy-eight acres, more or less, and generally known as 'the loop.'" On the 13th of August, 1869, James C. Kincaid sold to William Flanagan (whose interest was subsequently acquired by the appellants) another parcel of the same lands. This was by contract in writing, as was also the sale to the appellees. Subsequently the said John L. Peyton brought his suit in chancery to subject the lands sold to Kincaid to the payment of the balance of the unpaid purchase money. In this suit the unpaid balance of the purchase money was collected, and the deed having been filed by John L. Peyton in the papers of the cause, subject to the order of the court, when this result was attained. This deed, which conveyed the said land to Kincaid, was withdrawn by order of the court granting such leave, and recorded for the benefit of the vendees of Kincaid, and Kincaid made a deed to the appellants. And a dispute arising between the appellants and the appellees concerning a part of the land conveyed to the appellants by metes and bounds, whereby one hundred and forty-four acres so included in the tract sold to appellants were claimed by the appellees as belonging to them as a part of "the loop," the appellants, Fudge and McClintic, instituted their suit of ejectment against the said appellees, Payne and Oliver, for the recovery of the said one hundred and forty-four acres. Pend-

ing the progress of this suit (one hearing having resulted in a mistrial, the jury failing to agree), the appellees instituted their bill in chancery against the plaintiffs in said ejectment suit, seeking to enjoin and restrain the said appellants from further prosecuting their action of ejectment, and praying the court, on its chancery side, to reform the contract made by them, and that the court would define the land sold by said Kincaid to Payne and Oliver and designated in the said contract by the terms "the loop," upon the ground that at the time of the sale it was fully understood and agreed between the said Kincaid and Payne and Oliver that *all of the Peyton land lying above or east of the turnpike* was sold, and the term "the loop" used in said contract was understood and agreed between the parties thereto as a term intended to designate all of the Peyton land lying above or east of said turnpike; that they were fully satisfied at the time of the purchase that the term "the loop" used in said contract was sufficient designation and description of all of said lands, and that said term, as generally understood, did describe and include the said Peyton lands, including the lands now in controversy, and that they never knew there was any doubt about it until after the said Fudge and McClintic set up claim to the lands in controversy, and they were then informed and believed that the said term "the loop," *as generally understood*, did not include said lands in controversy, although it was agreed between them and said Kincaid that it did so include them, and that the appellants knew that they only purchased up to and not across the "Healing Springs turnpike"; that the circuit court, in the Peyton suit against Kincaid, had decreed a conveyance to them and also to the appellants, Fudge and McClintic, and that the deed made by Kincaid to the appellants should be set aside and excluded as evidence in said suit at law. The circuit court at the hearing reformed the deed so as to extend the loop lands to the "Healing Springs turnpike," and enjoined the plaintiffs from further

proceedings in the suit at law or using the deed from Kincaid to plaintiffs.

From this decree an appeal was applied for and obtained from one of the judges of this court.

As has already appeared, the grounds of this interference by the chancellor with the assertion of the plaintiffs' rights in the action at law for the land included within the metes and bounds of their written contract and in the deed of their grantor, was that the appellees, Payne and Oliver, at the time they entered into the written contract with their vendor, Kincaid, "fully understood, and it *was so agreed* between them and their vendor, Kincaid, that they bought all the lands east of the 'Healing Springs turnpike,' and that the term 'the loop' included and embraced all the lands east of said turnpike." It is not disputed that the contract between the parties, reduced to writing and duly executed at the time, contained no such statement, but quite the contrary. Not only is there no special definition given to "the loop" and its extent, but any special and distinct understanding of "the loop" as covering any land to the turnpike or otherwise, by special agreement or estimation, is negatived, and the contract, as if to exclude any individual opinion or estimated extent by the parties, disregards all boundaries; provides for the sale of a tract of land of five hundred and seventy-eight acres, *more or less*, and *generally* known as "the loop." There is no charge of fraud or surprise, but it is claimed that there was a mistake made by the appellants as to the meaning of the term "the loop," and it is sought to be set up and maintained by parol evidence. It is settled law that a plaintiff may introduce parol evidence to show fraud or mistake whereby a written contract fails to express the actual agreement, and to prove the modifications necessary to be made, whether such limitation consists in limiting the scope of the contract or in enlarging and extending it so as to embrace land or other subject matter which had been

omitted through mistake, and that he may then obtain a specific performance of the contract so varied, and such relief may be so granted, although the agreement is one which by the statute of frauds is required to be in writing. There is no doubt that a deed to land may be thus corrected, and, *a fortiori*, it may be said to be within the power of the court of equity to so reform, enlarge, or correct executory contracts. However, Mr. Pomeroy says: "No such relief can be granted either when the contract is executory or executed, and no parol evidence can be used to modify the terms of a written instrument, and most emphatically when that instrument is required by the statute of frauds to be in writing, *except* upon the occasion of mistake, surprise, or fraud. One or the other of these incidents must be alleged and proved before a resort can be had to parol evidence in such cases." Pom. Eq., 11, 335. Parol evidence is not in general admitted to vary a written instrument, but a case of mistake, fraud, surprise, or accident furnish exceptions to this general principle, and parol evidence may, in proper modes and within proper limits, be admitted to vary written instruments upon the ground of fraud, mistake, surprise, and accident.

It is settled that in the suits to reform a written instrument on the ground of a mutual mistake, parol evidence is always admissible to establish the fact of a mistake and in what it consisted, and to show how the writing should be corrected in order to conform to the agreement which the parties actually made; this is necessary in order to prevent fraud and injustice.

The demurrer to the bill in this case was properly overruled, it being alleged therein that, according to the true understanding of the parties, the written agreement did not express the real contract of the parties. This is said of the amended bill. The original bill was defective for want of necessary parties, Kincaid, the common vendor, being omitted, and the circuit court very properly sustained the demurrer to that bill. But while it is assigned as error it cannot be reviewed here, the

plaintiff having waived his right to appeal on that ground by amending his bill. But we must remember that, while courts of equity will in such cases admit parol evidence to establish in truth the real contract between the parties, notwithstanding the erroneous written agreement, the mistake will not be presumed because it is alleged, nor the fraud which may be charged be regarded until it is clearly proved. " The authorities all require that parol evidence of the mistake and of the alleged modifications must be most clear and convincing—in the language of some of the judges, 'the strongest possible'—or else the mistake must be admitted by the opposite party; the resulting proof must be established beyond a reasonable doubt. Courts of equity do not grant the high remedy of reformation upon a probability, nor even upon a mere preponderance of evidence, but only upon a certainty of the error." Opinion of Lord Thurlow in *Lady Shelbourne* v. *Lord Jachiquin,* 1 Bro. Ch. Cas., 338; *Calverly* v. *Williams,* 1 Ves., 210; *Bradford* v. *Union Bank,* 13 Howard (U. S.), 57–66; *Stockbridge Ins. Co.* v. *Hudson R. Ins. Co.,* 102 Mass., 45.

Chapman, J., in the last-named case, said: " The ordinary rule of evidence in civil actions, that the fact must be proved by a preponderance of evidence, does not apply to such a case as this. The proof that both parties intended to have the precise agreement set forth inserted in the deed, and omitted to do so by mistake, must be made beyond a reasonable doubt." In view of this well-settled principle, we will briefly consider the evidence in this case.

The controversy is, what did the parties intend to express by the term used in the written agreement, "the loop"? In the first place, the language of the written instrument itself is potential in favor of the plaintiff in this question of construction. It answers the question, what is meant by the term, "the loop"? In clear terms it says, "*generally known* as 'the loop'"—not what we agree is "the loop." The defendants allege that, although the written contract says the lands gene-

rally known as "the loop," they meant the lands east of the turnpike; and it appears in proof that the definition of the term they understood to be correct, as alleged by the defendants, was never so understood before by anybody, but that the lands known as "the loop" were generally understood—indeed, universally understood—to be the lands included in the loop formed by the juncture of two mountains, diverging from the point of juncture in wide curves, and that the line is well known to run along the mountain on the top of the ridge, and exactly where the special calls in the plaintiff's deed show it to be. The defendant, Oliver, sets forth very clearly in his bill his own mistake as very different from the fact as established, and yet it is proved that he lived in the immediate vicinity of this tract of land called "the loop," and before his purchase was well acquainted with the same, and after his purchase actually constructed a brush fence for cattle enclosure along the true line on the top of the ridge. The common vendor, Kincaid, denies any such supposed mistake, and proves the true line. I not only do not think the mistake is proved, but I think it quite clear that the contention of Oliver is an after-thought without any support from the proofs whatever. It is unreasonable to suppose that Oliver should have been utterly ignorant of this line along the mountain-top in his own neighborhood, and that he should purchase this land and yet be solitary in his ignorance, while all others, however indifferent in interest, should be so familiar with it. And yet this is so. It is a concession at the bar of this court that the true fact is not as the defendant alleges it was mutually understood. But it is insisted that, having the best means of knowledge and the greatest interest to know the truth, he was so ignorant as to be deceived by his vendor in a matter well understood by all others.

There is another ground upon which the defendant's claim is rendered very improbable: that is that the loop lands really did not lie wholly east nor wholly west of this turnpike, but,

being truly ascertained at the wide end of the loop, they cross the turnpike a short distance to the west, and a slight variation of the parol agreement sought to be set up would be an agreement to sell all the loop lands as generally understood lying east of the said turnpike. But I do not think we are left to conjecture upon the subject. The parties by their written agreement resolve the question as to the discussions of the loop by the words "*as generally understood*," and it is extremely improbable that, if they had held in their minds any special definition different from the truth, that they would not have set forth that special definition rather than content themselves with a reference to the general understanding upon the subject.

In our opinion, there is no evidence upon which to vary this written agreement between the parties, and that there is no proof of any mistake, and that this was not a case which called for equitable interference, and that the circuit court ought to have dismissed the bill of the plaintiffs, and allowed the plaintiffs in the ejectment suit to assert their rights in the common law suit. There are other interesting questions raised and discussed by the learned counsel on both sides, but the foregoing is, we think, the true solution of the dispute involved, and it is unnecessary to prolong the discussion concerning the other questions raised. The decree of the 30th of March, 1887, giving the relief prayed for in the amended bill, is erroneous, and the same must be reversed and annulled, and a decree will be rendered here dismissing the bill of the plaintiffs.

DECREE REVERSED.