Present:  All the Justices

JOHN M. WYATT, III, ET AL.

v.   Record No. 111497

MARK MCDERMOTT, ET AL.

OPINION BY
JUSTICE LEROY F. MILLETTE, JR.
April 20, 2012

UPON QUESTIONS OF LAW CERTIFIED BY THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF VIRGINIA

Pursuant to Article VI, Section 1 of the Constitution of Virginia and Rule 5:40, the United States District Court for the Eastern District of Virginia, Alexandria Division (the district court), by its order entered August 16, 2011, certified questions of law to this Court concerning whether Virginia recognizes tortious interference with parental rights as a cause of action and, if so, what elements constitute such a tort.

I. Background

The certified questions of law before us arise out of a motion before the district court to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Accordingly, the factual allegations in the complaint are accepted as true for the purposes of framing an answer that is responsive to the needs of the district court. See, e.g., Zinermon v. Burch, 494 U.S. 113, 118 (1990).

John M. Wyatt, III, is seeking monetary damages for the unauthorized adoption of his baby, herein referred to as E.Z.

1

E.Z. is the biological daughter of Wyatt and Colleen Fahland, who are unmarried residents of Virginia. Prior to E.Z.'s birth, Wyatt accompanied Fahland to doctors' appointments and made plans with Fahland to raise their child together. Without Wyatt's knowledge, Fahland's parents retained attorney Mark McDermott to arrange for an adoption. While Fahland informed Wyatt of her parents' desire that she see an adoption attorney, she assured Wyatt that they would raise the baby as a family. During a January 30, 2009 meeting with McDermott, Fahland signed a form identifying Wyatt as the birth father and indicating that he wanted to keep the baby. Fahland offered to provide Wyatt's address, but McDermott told her to falsely indicate on the form that the address was unknown to her, which she did. She also signed an agreement in which she requested that the adoptive parents discuss adoption plans with the birth father. Wyatt was "purposely kept in the dark" about this meeting, and Fahland continued to make false statements to Wyatt at the urging of McDermott, indicating that she planned to raise the baby with Wyatt, with the purpose that he would not take steps to secure his parental rights and prevent the adoption.

To facilitate an adoption, McDermott contacted "A Act of Love" (Act of Love), a Utah adoption agency, and Utah attorney

2

Larry Jenkins with Wood Jenkins LLP, a Utah law firm representing Act of Love.

Approximately one week prior to E.Z.'s birth, Fahland and her father met again with McDermott. At McDermott's urging, Fahland spoke to Wyatt briefly on the phone and then sent him a text message informing him that she was receiving information about a potential adoption. Later that day and throughout the week prior to E.Z.'s birth, Fahland continued to assure Wyatt that she still planned to raise the baby with him.

Fahland concealed the fact that she was in labor during conversations with Wyatt, at the direction of McDermott and on behalf of the other defendants. E.Z. was born two weeks early, on February 10, 2009, in Virginia, and Wyatt was not informed of the birth. The next day, Fahland signed an affidavit stating that she had informed Wyatt she was working with a Utah adoption agency and an affidavit of paternity identifying Wyatt as the father. Despite her full knowledge of his address, she placed question marks as to his contact information on the notarized documents at the urging of McDermott. Thomas and Chandra Zarembinski, Utah residents who retained Act of Love to assist them in adopting a child and planned to adopt E.Z., signed an agreement stating that they were aware that E.Z.'s custody status might be unclear. On February 12, Fahland signed an affidavit of relinquishment and transferred custody

to the Zarembinskis, who had travelled to Virginia to pick up the child. Wyatt claims all defendants induced Fahland to waive her parental rights knowing that Fahland did not want to relinquish rights to the baby and that Wyatt believed he would have parental rights.

On February 18, Wyatt initiated proceedings in the Juvenile and Domestic Relations Court of Stafford County, Virginia, to obtain custody of E.Z. Although Wyatt was ultimately awarded custody by the juvenile and domestic relations court, the Utah courts have awarded custody of E.Z. to the Zarembinskis. Wyatt has been involved in a protracted custody battle, the facts and proceedings of which are extensive; the salient details are simply that, at the time of the certification order, adoption proceedings were still pending in Utah, and E.Z. remains with the Zarembinskis in Utah to this date.

Wyatt filed an action in the district court against McDermott, Jenkins, Wood Jenkins LLP, Act of Love, the Zarembinskis, and Lorraine Moon, the Act of Love employee who facilitated the adoption (collectively, Defendants), seeking compensatory and punitive damages for the unauthorized adoption as well as a declaratory judgment under the Parental Kidnapping Prevention Act of 1980, Pub. L. No. 96-611, 94 Stat. 3568-3573, that Virginia had jurisdiction to award custody of the child.

4

Wyatt asserted numerous claims, including one for tortious interference with parental rights.  Upon consideration of a motion to dismiss filed by Defendants, the district court denied the motion as to the claim for tortious interference with parental rights pending its request that this Court adjudicate whether Virginia recognizes such a cause of action.[1]

The following questions were certified to this Court by the district court:

> 1.  Whether the Commonwealth of Virginia recognizes tortious interference with parental rights as a cause of action?
>
> 2.  If so, what are the elements of the cause of action, and what is the burden of proof of such a claim?

Rule 5:40(a) requires that a certified question be "determinative" in "any proceeding pending before the certifying court."  As the district court states, these questions are determinative in the proceedings pending before it because it must dismiss the claim for tortious interference with parental rights if no such cause of action exists under Virginia law.  Accordingly, by order entered September 23, 2011, we accepted the certified questions.

---

[1] The district court granted Defendants' motion to dismiss as to claims for assault, battery, and kidnapping; denial of civil rights under 42 U.S.C. § 1983; and a declaratory judgment under the Parental Kidnapping Prevention Act.  The district court denied the motion as to claims for conspiracy, fraud, and constructive fraud, finding that Wyatt had pled sufficient facts to state a claim for relief under each of those theories.

## II. Discussion

A statutory basis for tortious interference with parental rights is clearly absent from the Virginia Code; we therefore focus our analysis on whether this tort exists at common law. We conclude that, although no Virginia court has had occasion to consider the cause of action, the tort in question has indeed existed at common law and continues to exist today. Furthermore, rejecting tortious interference with parental rights as a legitimate cause of action would leave a substantial gap in the legal protection afforded to the parent-child relationship.

### A. Rightful Remedies

We recognize the essential value of protecting a parent's right to form a relationship with his or her child. We have previously acknowledged that "the relationship between a parent and child is constitutionally protected by the Due Process Clause of the Fourteenth Amendment." Copeland v. Todd, 282 Va. 183, 198, 715 S.E.2d 11, 19 (2011) (citing Quillon v. Walcott, 434 U.S. 246, 255 (1978)). Indeed, the Supreme Court of the United States has characterized a parent's right to raise his or her child as "perhaps the oldest of the fundamental liberty interests recognized by this Court." Troxel v. Granville, 530 U.S. 57, 65 (2000).

It follows, then, that a parent has a cause of action against third parties who seek to interfere with this right. In the analogous case of Chaves v. Johnson, 230 Va. 112, 335 S.E.2d 97 (1985), we explicitly recognized the common law tort of tortious interference with contract rights for the first time, noting its historical basis in the Commonwealth. We said:

> We have not previously had occasion to consider this precise aspect of the law of torts, although in Worrie v. Boze, 198 Va. 533, 95 S.E.2d 192 (1956), we affirmed a judgment granting relief for a tortious conspiracy to procure a breach of contract. There, we said: "It is well settled that the right to performance of a contract and the right to reap profits therefrom are property rights which are entitled to protection in the courts. Consequently, suits for procuring breach of contract proceed on this basis." Id. at 536, 95 S.E.2d at 196.

Id. at 119-20, 337 S.E.2d at 102. In Chaves, we were not creating a new tort but rather recognizing that the common law provided a cause of action for tortious interference with contract rights. The historical happenstance that the tort in question had not previously been invoked in Virginia did not prevent us from recognizing that the common law right of contract necessarily brought with it, as a corollary, a right to seek recompense against those who interfered with a valid contract. Noting the recognition of tortious interference with contract by many of our sister states, by many English courts, and in the Restatement of Torts, we concluded that a claim for

7

tortious interference with contract could be brought in Virginia. Id. It would be remarkable indeed if the common law right to be free from interference in contract were to be deemed to be more valuable than the common law right of a parent to be free from interference in a relationship with his or her child.

In this case, following the blueprint set forth in Chaves, we would not be creating a new tort, but rather recognizing that the common law right to establish and maintain a relationship with one's child necessarily implies a cause of action for interference with that right. To hold otherwise in this case would be to recognize "a right without a remedy — a thing unknown to the law." Norfolk City v. Cooke, 68 Va. (27 Gratt.) 430, 439 (1876).

We acknowledge that the most direct and proper remedy, the return of the child and restoration of the parent-child relationship, may never be achieved through a tort action. When a parent has been unduly separated from a child by a third party for a substantial period of time without due process of law, however, other legitimate harms may be suffered that are properly recoverable in tort, including loss of companionship, mental anguish, loss of services, and expenses incurred to recover the child.

8

An examination of our law shows that the redress of these wrongs is in some circumstances otherwise unavailable in the Commonwealth. Wrongful custodial interference is codified in Code § 18.2-49.1 as a criminal offense, but this statute provides no civil recovery. Virginia also has well-developed custody laws to manage intra-familial disputes, but custody disputes do not implicate rights or duties of third parties, such as are at issue here.[2] The Commonwealth provides for causes of action for fraud and constructive fraud, but a third party can wrongfully interfere with parental rights without engaging in fraudulent behavior. There remain many cognizable scenarios in which intentional tortious interference with parental rights could be invoked not as a legal redundancy, but as a unique remedy.

---

[2] Neither are we persuaded by the argument that, since an action for tortious interference with parental rights requires a threshold element of establishing parental rights, the cause of action cannot lie because this determination cannot be made in tort. Our law regularly allows for adjudications of elements in tort that lie separate from adjudications for other purposes, such as when a defendant may be held civilly liable but not criminally guilty for the same offense. The fact that parental rights are an element of the tort does not act as a per se bar to the recognition of the tort. The finding of parental rights in tort would not dictate the outcome of a custody proceeding or adoption, although a custody determination or adoption could provide evidence of parental rights in a tort proceeding.

B. Common Law Origins and Persuasive Authority

The recognition of tortious interference with parental rights finds precedent in our common law.  We have previously stated that "our adoption of English common law . . . ends in 1607 upon the establishment of the first permanent English settlement in America, Jamestown. From that time forward, the common law we recognize is that which has been developed in Virginia."  Commonwealth v. Morris, 281 Va. 70, 82, 705 S.E.2d 508 (2011).  Prior to 1607, a comparable cause of action did lie in England, providing a father with recourse for the abduction of his heir or sons rendering services.  See Pickle v. Page, 169 N.E. 650, 651 (N.Y. 1930) (citing Barham v. Dennis, (1599) 78 Eng. Rep. 1001 (K.B.); Cro. Eliz. 770).

Clearly, there are ways in which this ancient writ is markedly different from the modern cause of action urged by Wyatt, which would permit recourse for either parent, regardless of gender, and which encompasses a recovery not merely for loss of services but also for loss of companionship. This difference reflects society's changing values as reflected in this Court's rulings over the centuries, including principles of gender equality, an inherent value in the relationship between parents and their children beyond the value of services rendered, and the modern trend in tort law to

make plaintiffs whole by compensating not only pure pecuniary loss but also emotional harm.

Although the action has not heretofore been brought in Virginia, and hence has never come before this Court, its evolution elsewhere can be clearly identified. Blackstone wrote that the abduction of any child, not merely an heir, was "remediable by writ of ravishment, or, action of trespass vi et armis, de filio, vel filia, rapto vel abducto; in the same manner as the husband may have it, on account of the abduction of his wife." 3 William Blackstone, Commentaries *140-41 (internal footnote omitted). By 1938, the American Law Institute's first Restatement of Torts included recovery for the abduction of a child, and the Restatement (Second) of Torts § 700 recites the more modern embodiment of the ancient writ: "One who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent."

In Stone v. Wall, 734 So.2d 1038 (Fla. 1999), the Florida Supreme Court, responding to a certified question of law from the United States Court of Appeals for the Eleventh Circuit, recognized the common law tort of custodial interference in Florida as a modern iteration of the English common law writ:

11

As indicated, the tort of intentional interference with the custodial parent-child relationship has its origins in English common law and is derived from a cause of action for the abduction of the father's heir.  The tort has evolved significantly since 1600 so that in its contemporary version either custodial parent may recover, the child does not have to be the heir, and recovery is not predicated on loss of services but on the sanctity of the parent-child relationship.

It would be violative of constitutional equal protection issues not to recognize the equal rights of both parents in allowing either a cause of action or an element of damages.  Additionally, outdated common law principles based on the view that children are nothing more than the economic assets of their parents have likewise been replaced with a more enlightened and realistic view of the role of children in their parents' lives.  Thus, the cause of action for interference with a custodial parent-child relationship is a natural progression of the common law with due regard for constitutional principles, changes in our social and economic customs, and present day conceptions of right and justice.

Id. at 1044 (internal citations and quotation marks omitted).

The overwhelming majority of the high courts of our sister states that have considered the issue have also recognized such a tort, many of them tracing its evolution in the common law. See, e.g., Anonymous v. Anonymous, 672 So.2d 787, 789, (Ala. 1995) (noting that the Restatement (Second) of Torts § 700 does not represent a new tort in Alabama but rather "accurately reflects the common law principle that parents have a right to the care, custody, services and companionship of their minor children, and [that] when they are wrongfully deprived thereof by another, they have an action therefor" (internal quotation

12

marks omitted)); <u>Washburn v. Abram</u>, 90 S.W. 997, 998 (Ky. 1906) (concluding that, although the common law right of action historically arose from the right of the father to recover for lost services of his child and such allegations are necessary for recovery, "[i]t matters not whether the child [actually] renders such services; and [the parent] is not confined in a recovery to the loss of services alone, but may recover damages for injury to his feelings and the loss of companionship of his child"); <u>Khalifa v. Shannon</u>, 945 A.2d 1244, 1248-62 (Md. 2008) (recognizing a common law action of interference with parental-child relations against one who abducts and/or harbors a child, and, in a thorough discussion of the evolution of the common law, finding that loss of services was never a substantive element of the common law tort but rather tied to certain ancient English forms of remedy); <u>Plante v. Engel</u>, 469 A.2d 1299, 1302 (N.H. 1983) (holding the intentional aiding and abetting in the interference of parental rights to be an actionable tort in New Hampshire); <u>Silcott v. Oglesby</u>, 721 S.W.2d 290, 293 (Tex. 1986) (recognizing that the common law had evolved to substantially track the Restatement (Second) of Torts § 700); <u>Kessel v. Leavitt</u>, 511 S.E.2d 720 (W.Va. 1998) (upholding a finding of tortious custodial interference against maternal grandparents, uncle, and mother's attorney, but not the child's mother, due to her equal parental rights). <u>Kessel</u>,

13

which likewise addressed an adoption dispute, provides a particularly helpful model for the elements of the tort.[3]  See Part II.D., infra.

In evaluating certified questions of law, we are ultimately charged with "stating the law governing each question."  Rule 5:40(i).  The evolution of the common law of our sister states and of the laws of England where similar actions have been brought since 1607 provides persuasive authority as to the certified questions of law set before the

---

[3]  Justice McClanahan asserts in her dissent that the recognition of custodial interference torts, addressed in some of the above-referenced cases, is irrelevant to the tort of parental interference in the context of an unauthorized adoption because "Comment (c) [of the Restatement (Second) of Torts § 700] states that [the cause of action] does not apply when parents are entitled to joint custody and can only be brought by the parent with sole or superior custody rights."

Comment (c) states:

When both parents entitled to custody and earnings.  When the parents are by law jointly entitled to the custody and earnings of the child, no action can be brought against one of the parents who abducts or induces the child to leave the other.  When by law only one parent is entitled to the custody and earnings of the child, only that parent can maintain an action under the rule stated in this Section.  One parent may be liable to the other parent for the abduction of his own child if by judicial decree the sole custody of the child has been awarded to the other parent.

Thus, Comment (c) indeed bars suits between parents with equal rights.  It does not, however, bar proceedings against third parties, nor does it require a custodial adjudication to warrant a suit against a third party.

14

Court:  whether the common law recognizes tortious interference with parental rights and, if so, what elements comprise the tort.

### C.  Public Policy and Legislative Deference

We have a long tradition of deference to the legislature concerning the adoption of any new theory of liability, especially when conflicting public policy issues abound.  Bell v. Hudgins, 232 Va. 491, 495, 352 S.E.2d 332, 334 (1987).  Our recognition of an existing common law tort is consistent with this tradition of deference.  Indeed, in accordance with legislative authority, the Court is obligated to continue to enforce this tort as the law of the Commonwealth.  The General Assembly expressly directed in Code § 1-200 that "[t]he common law of England, insofar as it is not repugnant to the principles of the Bill of Rights and Constitution of this Commonwealth, shall continue in full force within the same, and be the rule of decision, except as altered by the General Assembly."

As explained in Part II.B., supra, the common law recognized an English writ providing a tort claim based on wrongful interference with the parent-child relationship prior to 1607.  This claim has never been altered by the General Assembly and is repugnant to the principles of the Bill of Rights and Constitution of the Commonwealth only insofar as it,

15

historically, was applied in such a manner that protected the interests of fathers over mothers and valued male children over female children. Given that this gender bias existed throughout 17th century common law, the proper remedy is not to overlook the writ but rather to recognize the claim in a manner consistent with the Bill of Rights and the Constitution of the Commonwealth, providing equal rights to both genders and allowing the common law claim to "continue in full force within [the Commonwealth]," by operation of the plain language of Code § 1-200. See, e.g., Jenkins v. Mehra, 281 Va. 37, 44, 704 S.E.2d 577, 581 (2011) (concluding that "[a]brogation of the common law . . . occurs only when the legislative intent to do so is plainly manifested, as there is a presumption that no change was intended," and explaining that "[w]hen an enactment does not encompass the entire subject covered by the common law, it abrogates the common[] law rule only to the extent that its terms are directly and irreconcilably opposed to the rule." (second and third alterations in original) (internal quotation marks omitted)).

The General Assembly possesses the authority to enact legislation addressing the appropriate avenues for civil recovery in cases of interference with parental rights and offering guidance to this Court. To date, it has declined to do so. The General Assembly's prerogative to legislate does

16

not negate our own judicial mandate to provide redress for injuries to recognized common law rights that occur to residents of the Commonwealth. When such injuries occur, it is appropriate that we offer a means of redress, and doing so does not usurp legislative authority.

We are not persuaded by the argument that we should interpret the General Assembly's statutory abolition of the cause of action for alienation of affection, found in Code § 8.01-220, as somehow precluding a recognition of a cause of action for tortious interference with parental rights. These are distinct causes of action with separate elements:

> "Tortious interference with parental or custodial relationship" intimates that the complaining parent has been deprived of his/her parental or custodial rights; in other words, but for the tortious interference, the complaining parent would be able to exercise some measure of control over his/her child's care, rearing, safety, well-being, etc. By contrast, "alienation of affections" connotes only that the parent is not able to enjoy the company of his/her child; this cause of action does not suggest that the offending party has removed parental or custodial authority from the complaining parent.

Kessel, 511 S.E.2d at 761 n.44.

The Florida Supreme Court, citing Kessel with approval, likewise recognized the common law tort of tortious interference despite a prior statutory abolition of an action for alienation of affection. Stone, 734 So.2d at 1045. The Restatement (Second) of Torts also considers

17

these causes of action to be two separate torts, and rejects alienation of affection claims while approving of the cause of action for tortious interference. See Restatement (Second) of Torts § 699 ("One who, without more, alienates from its parent the affections of a child, whether a minor or of full age, is not liable to the child's parent."). The added element of physical separation from the parent in tortious interference renders the torts distinct.

In sum, it is clearly the case that this ancient writ – today labeled tortious interference with parental rights – did exist in English common law in 1607, that it can be construed in a manner not repugnant to the Bill of Rights and the Constitution of the Commonwealth, and that no affirmative steps have been taken by the legislature to renounce the tort. We therefore answer the first certified question of law in the affirmative.

### D.  Nature of the Tort

#### 1.  Elements

The Court is now left to determine what elements are essential to the tort as it exists today, consistent with the original writ, but in line with equal protection and modern law. Kessel succinctly lays out the elements of this cause of action, consistent with Virginia law:

> (1) the complaining parent has a right to establish or maintain a parental or custodial relationship with his/her minor child; (2) a party outside of the relationship between the complaining parent and his/her child intentionally interfered with the complaining parent's parental or custodial relationship with his/her child by removing or detaining the child from returning to the complaining parent, without that parent's consent, or by otherwise preventing the complaining parent from exercising his/her parental or custodial rights; (3) the outside party's intentional interference caused harm to the complaining parent's parental or custodial relationship with his/her child; and (4) damages resulted from such interference.

511 S.E.2d at 765-66.

Given the nature of the original English common law writ, we must consider whether the harm and recoverable damages must be limited solely to tangible loss of service. We join the high court of Maryland in concluding that "a focused analysis reveals that loss of services has never been an element of the tort itself, but rather, arose from common law pleading requirements in force in England," which contained "artificial divisions" between tangible loss of services and intangible losses such as comfort and society.[4] Khalifa, 945 A.2d at 1256,

---

[4] Under English form pleadings, interference with the parent-child relationship could be redressed by an action of trespass, and the plaintiff was required to elect between pleading trespass vi et armis, which claimed direct tangible injury, and trespass on the case, which claimed indirect intangible injury. Khalifa, 945 A.2d at 1256-57. Virginia has since rejected this distinction as "so nice and useless that both the courts and the legislatures have manifested a decided purpose to abolish the distinction." Stonegap Colliery v. Hamilton, 119 Va. 271, 279-80, 89 S.E. 305, 307 (1916).

19

1262.  The evolution from form- to fact-based pleading in Maryland, as in Virginia, dictates that the ancient pleading requirements of English writs "no longer serve to define the elements of the tort."  Id. at 1262.  We therefore conclude that the modern iteration of this common law tort encompasses both tangible and intangible damages, including compensatory damages for the expenses incurred in seeking the recovery of the child, lost services, lost companionship, and mental anguish.  Equitable remedies such as injunctions or custody orders may not be awarded under this cause of action.

Finally, as we have previously stated, "[I]f a tortfeasor's tort was intentional rather than negligent, i.e., deliberately committed with intent to harm the victim . . . and if the evidence is sufficient to support an award of compensatory damages, the victim's right to punitive damages and the quantum thereof are jury questions."  Smith v. Litten, 256 Va. 573, 579, 507 S.E.2d 77, 80 (1998); see also Giant of Virginia, Inc. v. Pigg, 207 Va. 679, 685-86, 152 S.E.2d 271, 277 (1967).

### 2.  Burden of Proof

We adhere to the ordinary burden in civil actions of preponderance of the evidence.  Fudge v. Payne, 86 Va. 303, 308, 10 S.E. 7, 8 (1889).  We find no precedent to indicate that this writ required any heightened standard of proof.  We

20

require a heightened standard of clear and convincing evidence for intentional infliction of emotional distress, for instance, because it is an action not favored by this Court due to the inherent ambiguity in proving harm to one's emotions or mind. Russo v. White, 241 Va. 23, 26, 400 S.E.2d 160, 162 (1991). Although, as with many torts, juries may award some compensation for mental anguish in intentional interference cases, the harm lies in the physical interruption of the parent-child relationship, a concrete factor. Thus, we conclude that the ordinary burden of preponderance of the evidence is appropriate for a claim of intentional interference with parental rights.

### 3. Affirmative Defenses

The minority of states that have resisted recognition of tortious interference with parental or custodial rights have done so based on policy grounds, citing concern for the best interest of the child. In Larson v. Dunn, 460 N.W.2d 39 (Minn. 1990), the Minnesota Supreme Court concluded that it was not in the best interest of children to permit such a tort, because "the law should not provide a means of escalating intrafamily warfare." Id. at 46. The court concluded that a tort possessing the potential for such significant impact on children should be properly evaluated as a matter of public policy by the legislature rather than created by the courts.

21

<u>Id.</u> at 47.  The Minnesota Supreme Court's emphasis on the best

interest of the child was followed two years later by the

Oklahoma Supreme Court in <u>Zaharias v. Gammill</u>, 844 P.2d 137,

140 (Okla. 1992) ("We are convinced that the tort of

interference with custodial relations would not enhance the

scheme of family law in Oklahoma, and we expressly disapprove

of it.").

We share these courts' concern for the well-being of

children caught in intra-familial disputes, a concern that was

not as prominent an issue in 1607, when only a male parent

could bring this cause of action.  The fear that this cause of

action would be used as a means of escalating intra-familial

warfare can be largely disposed of by barring the use of this

tort between parents, as other state courts have done.  The

West Virginia high court put this well in <u>Kessel</u>:

> [W]e hold that a parent cannot charge his/her child's
> other parent with tortious interference with parental
> or custodial relationship if both parents have equal
> rights, or substantially equal rights (as in the case
> of a nonmarital child where the putative biological
> father seeks to establish a meaningful parent-child
> relationship with his child and, until such a
> relationship has been commenced, does not have rights
> identical to those of the child's biological mother),
> to establish or maintain a parental or custodial
> relationship with their child.  In other words, when
> no judicial award of custody has been made to either
> parent, thereby causing the parents' parental and
> custodial rights to be equal, no cause of action for
> tortious interference can be maintained by one parent
> against the other parent.  Likewise, where no
> judicial decree has been entered awarding custody of

22

> a nonmarital child to one or the other of the child's
> biological parents, the complaining biological parent
> cannot assert a claim of tortious interference with
> parental or custodial relationship against the other
> biological parent.

511 S.E.2d at 766.  A similar bar is articulated in Comment (c) to the Restatement (Second) of Torts § 700, excerpted in footnote 3, supra.  Thus, we conclude that a defendant may raise an affirmative defense of "substantially equal rights," as explained above in Kessel, as it is to the advantage of all parties that such a determination be made early in the proceedings.

Additionally, in the interest of the child, we note with approval the affirmative defense of justification as set forth in Kessel, wherein the court held that a party should not be held liable if he or she

> possessed a reasonable, good faith belief that
> interference with the parent's parental or custodial
> relationship was necessary to protect the child from
> physical, mental, or emotional harm[; or] possessed a
> reasonable, good faith belief that the interference was
> proper (i.e., no notice or knowledge of an original or
> superseding judicial decree awarding parental or custodial
> rights to complaining parent); or reasonably and in good
> faith believed that the complaining parent did not have a
> right to establish or maintain a parental or custodial
> relationship with the minor child (i.e., mistake as to
> identity of child's biological parents where paternity has
> not yet been formally established).

511 S.E.2d at 766.

We do not cite these as an exhaustive list of available defenses, but rather note them due to their particular

23

importance, so that our explicit recognition of this tort does not promote unnecessary intra-familial litigation or deter an individual from acting when he or she holds a good-faith belief that a child is in danger.

### III. Conclusion

Often, in considering a certified question of law, the facts of a particular case serve only to define the scope of the inquiry to yield a determinative answer for the presiding court. In this instance, however, the facts as pled are illustrative of the basis and continuing need for this action in tort.

It is both astonishing and profoundly disturbing that in this case, a biological mother and her parents, with the aid of two licensed attorneys and an adoption agency, could intentionally act to prevent a biological father — who is in no way alleged to be an unfit parent — from legally establishing his parental rights and gaining custody of a child whom the mother did not want to keep, and that this father would have no recourse in the law. The facts as pled indicate that the Defendants went to great lengths to disguise their agenda from the biological father, including preventing notice of his daughter's birth and hiding their intent to have an immediate out-of-state adoption, in order to prevent the legal establishment of his own parental rights. This Court has long

recognized that the rights of an unwed father are deserving of protection. Hayes v. Strauss, 151 Va. 136, 141, 144 S.E. 432, 434 (1928). The tort of tortious interference with parental rights may provide one means of such protection. Finally, we hope that the threat of a civil action would help deter third parties such as attorneys and adoption agencies from engaging in the sort of actions alleged to have taken place.

For the aforementioned reasons, we answer the first certified question in the affirmative, and we answer the second certified question by referring the United States District Court for the Eastern District of Virginia to Part II.D. of this opinion.

Certified questions answered in the affirmative.

JUSTICE MIMS, dissenting.

I agree with the conclusion in Justice McClanahan's dissent that the tort of interference with parental rights arising from an unauthorized adoption does not currently exist under Virginia law. I believe that conclusion ends the inquiry. Consequently I would answer the first certified question in the negative.

JUSTICE McCLANAHAN, with whom JUSTICE GOODWYN joins, dissenting.

While the facts as pled by Wyatt are unquestionably disturbing, I cannot join the majority's effort to deter such

25

conduct by legislating public policy in Virginia through judicial pronouncement.

I do not agree that the tort of interference with parental rights arising from an unauthorized adoption currently exists under Virginia law.

[1] English common law prior to 1607 did not recognize a cause of action in tort for interference with parental rights. Under the law as stated in Barham v. Dennis, (1599) 78 Eng. Rep. 1001 (K.B.); Cro. Eliz. 770, a father could only seek the pecuniary loss of his heir's marriage prospects under an action of trespass for the taking of his heir. Such action was not based on the protection of a parental relationship but on the protection of a property interest.[2] As the majority of the Court of King's Bench stated in Barham, "the father hath not

---

[1] It cannot be disputed that "the relationship between a parent and child is constitutionally protected by the Due Process Clause of the Fourteenth Amendment." Copeland v. Todd, 282 Va. 183, 198, 715 S.E.2d 11, 19 (2011) (citing Quilloin v. Walcott, 434 U.S. 246, 255 (1978)). But what follows from this constitutionally protected interest is the principle that the state cannot attempt to interfere with the natural parental relationship absent a showing of unfitness, Quilloin, 434 U.S. at 255, not that a private right of action exists against third parties who seek to interfere with a parental relationship. See also Troxel v. Granville, 530 U.S. 57, 67 (2000) (visitation order was unconstitutional infringement by state on fundamental parental rights).

[2] Wyatt does not claim that E.Z. was physically taken from him or ask this Court to recognize a cause of action in tort for the abduction of a child. He claims McDermott prevented him from establishing a parental relationship with E.Z. through an unauthorized adoption.

26

any property or interest in the [child, not an heir], which the law accounts may be taken from him." Id. at 1001; Cro. Eliz. at 770.[3] Although English common law later recognized an action of trespass where a child old enough to do the father service was taken, under such an action, "[t]he mere relationship of the parties [was] not sufficient to constitute a loss of service." Hall v. Hollander, (1825) 107 Eng. Rep. 1206 (K.B.) 1207; 4 Barn. & Cress. 660, 662.[4] Thus, even as late as 1825, English common law did not recognize a cause of action grounded in the parental relationship. Furthermore, since adoption of children was not recognized at common law and is entirely a

---

[3] The majority concedes the English common law action of trespass for taking of a child "is markedly different" from the cause of action asserted by Wyatt and does not reflect modern societal views on gender equality and the parental relationship. Indeed, the majority does not adopt this ancient writ but creates a new tort while simultaneously reasoning that the Court is "obligated to enforce this tort as the law of the Commonwealth."

[4] Because the English action of trespass only provided fathers with a cause of action for the loss of a property interest in the heir's marriage, and later for the loss of services, courts in New York and Florida repudiated the English action of trespass in favor of a new cause of action in tort for abduction of a child from the lawful custodian. See, e.g., Stone v. Wall, 734 So.2d 1038, 1044 (Fla. 1999) (court reasoning that "outdated common law principles based on the view that children are nothing more than the economic assets of their parents" should be replaced with a tort that is "not predicated on loss of services but on the sanctity of the parent-child relationship"); Pickle v. Page, 169 N.E. 650, 653 (N.Y. 1930) (recognizing that while under Barham a father had no remedy except for the taking of a son and heir, the court would recognize a cause of action for abduction from a lawful custodian "without resort to the fiction that a loss of service has been occasioned").

27

creature of statute, <u>Fletcher v. Flanary</u>, 185 Va. 409, 411-12, 38 S.E.2d 433, 434 (1946), a cause of action premised upon the unauthorized adoption of a child could not have existed under English common law. And, Code § 1-200 does not obligate this Court to enforce a cause of action that did not exist prior to 1607.

Accordingly, since English common law as it existed in 1607 did not protect the parental relationship but only protected the property rights of a father in his heir's marriage, and since Virginia common law from that time forward has not recognized a cause of action for interference with parental rights, I cannot conclude that the cause of action asserted by Wyatt currently exists in Virginia. See <u>Commonwealth v. Morris</u>, 281 Va. 70, 82, 705 S.E.2d 503, 508 (2011) (Our adoption of English common law "ends in 1607" and "[f]rom that time forward, the common law we recognize is that which has been developed in Virginia.").[5]

---

[5] I disagree that the tort of interference with parental rights is analogous to our existing common law of tortious interference. We have recognized a cause of action for intentional interference with valid contractual relationships or business expectancies based on the " 'right to reap profits therefrom.' " <u>Chaves v. Johnson</u>, 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985) (quoting <u>Worrie v. Boze</u>, 198 Va. 533, 536, 95 S.E.2d 192, 196 (1956)). Neither the interests protected, nor the policy considerations involved, can be meaningfully compared. <u>Cf.</u> <u>Naccash v. Burger</u>, 223 Va. 406, 413, 290 S.E.2d 825, 829 (1982) (whether scope of common law negligence

28

Because I do not believe the tort of interference with parental rights currently exists in Virginia, the decision of whether to create such a cause of action should be left to the legislature in light of the competing and far-reaching public policy considerations that are involved.  Bell v. Hudgins, 232 Va. 491, 495, 352 S.E.2d 332, 334 (1987).  See also Advanced Towing Co., LLC v. Board of Supervisors, 280 Va. 187, 191, 694 S.E.2d 621, 623 (2010) ("[r]espect for the separation of the powers of the legislative and judicial branches of government is an essential element of our constitutional system"); Taylor v. Worrell Enters., Inc., 242 Va. 219, 221, 409 S.E.2d 136, 137-38 (1991) (the principle of separation of powers "prevents one branch from engaging in the functions of another, such as the judicial branch performing a legislative function, or the legislative branch taking on powers of a judicial nature") (citations omitted).  When the question of whether to recognize a new theory of liability involves a multitude of competing interests,

> which courts are ill-equipped to balance, . . . the legislative machinery is specially geared to the task. A legislative change in the law is initiated by introduction of a bill which serves as public notice to all concerned. The legislature serves as a forum for witnesses representing interests directly affected by the decision. The issue is tried and tested in the crucible of public debate. The decision

doctrine encompasses medical malpractice action for wrongful birth within the province of the judiciary).

29

> reached by the chosen representatives of the people reflects the will of the body politic. And when the decision is likely to disrupt the historic balance of competing values, its effective date can be postponed to give the public time to make necessary adjustments.

Bruce Farms, Inc. v. Coupe, 219 Va. 287, 293, 247 S.E.2d 400, 404 (1978).

In creating an action for tortious interference with parental rights arising from an unauthorized adoption, there are many significant and varying interests that will be affected. The interests of the biological parents, the adoptive parents, and the child[6] are impacted as well as the legitimate interest in facilitating adoptions for those who seek to place their child for adoption and for those who wish to be adoptive parents. The recognition of this new cause of action also affects the operations and actions of adoption agencies, adoption attorneys and other professionals or governmental agencies involved in the adoption process, which may be subject to liability. Furthermore, the General Assembly has already enacted specific provisions governing the rights of the biological and adoptive parents.[7] Moreover, the factual and

---

[6] The meaning of "the best interests of the child" is different in the context of custody disputes than it is in the context of adoptions since the biological parents' due process rights in their relationship to their child must be considered. Copeland, 282 Va. at 197, 715 S.E.2d at 19.

[7] The Virginia General Assembly has enacted comprehensive legislation governing the issues relating to parental rights,

30

legal determinations in a tort action may necessarily involve the same factual and legal questions pending or already ruled upon in the context of adoption or custody proceedings based on the statutory provisions governing such proceedings. "The sheer number of issues that can be raised in a debate of this nature demonstrates the inadequacy of the judicial process to balance these competing concerns." Robinson v. Matt Mary Moran, Inc., 259 Va. 412, 418, 525 S.E.2d 559, 563 (2000). In my view, the answers to the questions raised by these competing policy interests "should come from the General Assembly and not the courts." Bell, 232 Va. at 495, 352 S.E.2d at 334.[8]

---

specifically including establishment of a parental relationship, child custody, and adoption. See, e.g., Code § 20-49.1 (how parent and child relationship established); Code §§ 20-49.2 et seq. (proceedings to determine parentage or establish paternity); Code §§ 20-124.1 et seq. (custody and visitation); Code §§ 63.2-1200 et seq. (adoption). The General Assembly has also enacted legislation criminalizing certain actions that may interfere with parental or custodial relationships. See, e.g., Code § 18.2-47 (abduction and kidnapping); Code § 18.2-49.1 (violation of court orders regarding custody and visitation). The General Assembly has not, however, enacted legislation imposing civil liability or otherwise permitting the recovery of money damages for acts that interfere with parental or custodial rights.

[8] The majority has chosen to follow the decision of the Supreme Court of West Virginia in Kessel v. Leavitt, 511 S.E.2d 720 (W.Va. 1998), recognizing tortious interference with parental rights in the context of an unauthorized adoption. The court in Kessel discussed at length the competing interests of the various parties involved in the adoption process, noting that there are several cases of national prominence involving the "trampling" of a biological father's rights resulting in the "wrenching of children from their adoptive families" and that cases involving the placement of a child in another

31

We recently reaffirmed the principle that decisions involving competing individual and societal interests fall within the scope of legislative, not judicial, authority. Bevel v. Commonwealth, 282 Va. 468, 479-80, 717 S.E.2d 789, 795 (2011) (if it is to be the policy in Virginia that a criminal conviction will abate upon defendant's death while appeal is pending, "the adoption of such a policy and the designation of how and in what court such a determination should be made is more appropriately decided by the legislature, not the courts"). See also Uniwest Constr., Inc. v. Amtech Elevator Servs., 280 Va. 428, 440, 699 S.E.2d 223, 229 (2010) ("The

---

jurisdiction are an "increasingly common . . . method by which to thwart a biological father's parental rights." Id. at 823-24. Recognizing that its decision was "not an appropriate forum in which to dissect and repair all of the ailments of existing adoption procedures," it nonetheless proceeded to "redress, in part, the intentional deprivation of a biological father's right to establish a relationship with his child," while simultaneously acknowledging that its legislature has already taken action in that regard. Id. at 824. In fact, the court conceded the scope of its decision may be limited by legislative enactments. Id. at 756, n. 37. In my opinion, the rationale espoused by the Kessel court does not support the majority's creation of this new tort in Virginia. To the contrary, it aptly illustrates the serious policy considerations involved in determining the existence and scope of such a cause of action. In the Commonwealth of Virginia, it is not the role of the judiciary to weigh these competing interests and adopt a policy of law that will best serve these interests. It is the role of the legislature "to formulate public policy, to strike the appropriate balance between competing interests, and to devise standards for implementation." Wood v. Board of Supervisors, 236 Va. 104, 115, 372 S.E.2d 611, 618 (1988).

32

public policy of the Commonwealth is determined by the General Assembly [because] it is the responsibility of the legislature, and not the judiciary, . . . to strike the appropriate balance between competing interests.") (internal quotation marks and citation omitted)). Likewise, if public policy demands that parties involved in the adoption process should be held liable in tort for interference with parental rights, "this should be accomplished, [I] think, by an appropriate act of the General Assembly, and not by judicial pronouncement." Hackley v. Robey, 170 Va. 55, 66, 195 S.E. 689, 693 (1938).[9]

---

[9] As the majority notes, a significant number of other states have recognized a cause of action for intentional interference with custodial rights based on the Restatement (Second) of Torts § 700 (1977). That section, entitled "Causing [a] Minor Child to Leave or not to Return Home[,]" provides that "one who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent." Comment (c) to this section states that it does not apply when parents are entitled to joint custody and can only be brought by the parent with sole or superior custody rights. Adopting or relying on this section, these courts have recognized a cause of action for interference with custodial rights in this context. But Wyatt does not seek recognition of a cause of action for the taking of a child in the context of a violation of a custody order in which he has sole or superior lawful custody. Rather, he seeks recognition of a cause of action for tortious interference with parental rights arising from an unauthorized adoption. The only decision cited by the majority recognizing a cause of action for an unauthorized adoption is Kessel. Instead of weighing the serious policy considerations impacted by creating a cause of action arising from an unauthorized adoption as the court did in Kessel, however, I would leave that task to the General

33

Accordingly, because I do not believe that Virginia currently recognizes a cause of action for tortious interference with parental rights arising from an unauthorized adoption, and that the decision to recognize this tort in Virginia should be made by the General Assembly, I would answer certified question one in the negative.

---

Assembly, which bears the responsibility for formulating the public policy of Virginia.