PRESENT: All the Justices

AMANDA C. PADULA-WILSON

v. Record No. 190107

SCOTT DAVID LANDRY, ET AL.

OPINION BY
JUSTICE STEPHEN R. McCULLOUGH
May 14, 2020

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Charles James Maxfield, Judge Designate

This case calls upon us to address the scope of the tort of interference with parental

rights. The mother of three children involved in custody and visitation proceedings alleges that

various professionals who participated in those proceedings, including the children's guardian ad

litem, and several counselors and therapists, conspired, lied, and acted maliciously among other

things, to deprive the mother of the rightful custody of her children and thereby tortiously

interfered with her parental rights. The children's mother also alleges that one of the therapists

defamed her. The circuit court granted the defendants' demurrers to these claims. For the

reasons we articulate below, we will affirm the judgment of the circuit court.

BACKGROUND

The following background emerges from the allegations in the complaint and the exhibits

attached to the complaint.

I.    THE DIVORCE AND CHILD CUSTODY PROCEEDINGS.

Michael Wilson and Amanda C. Padula-Wilson married in August 1999. Three children

were born of the marriage, A.W., C.W., and A.G.W.[1] The parties separated in 2012. Initially,

Padula-Wilson had custody of the children; Wilson had supervised visitation. In the context of

adjudicating custody and visitation, the circuit court appointed Scott Landry to serve as the

---

[1] A.W. attained the age of majority while this case was pending below.

children's guardian ad litem. Michele Nelson, Ph.D., a partner at Forensic Psychology Associates, PC ("Forensic"), was appointed to conduct mental evaluations of both parents and she was later engaged, over Padula-Wilson's objection, to set a visitation schedule between Padula-Wilson and her children. Following a recommendation from Dr. Nelson, Dr. Jill Gasper, Ph.D., conducted reunification therapy between Wilson and C.W. Laura Wert was hired to provide therapy for C.W. Cara Campanella provided therapy for A.W. and A.G.W. Campanella and Wert practice at the Westwood Group ("Westwood").

Dr. Gasper initially recommended to Landry a plan of visitation and that neither parent "record the children . . . for purposes of litigation" or "discuss with the children litigation related matters [or] relocation plans."

In April 2013, C.W. told Landry that Wilson was physically abusive and provided a written account of having been physically abused.[2] After later meeting with Padula-Wilson, Landry wrote a report recommending that the custody court award joint legal custody with physical custody to Padula-Wilson.

Several days later, Landry, Dr. Nelson, and Dr. Gasper discovered a website that Padula-Wilson had created about the case. The website included videos of the children and mentioned Landry, Dr. Nelson, and Dr. Gasper. Landry and Dr. Gasper thereafter altered their reports to recommend that Wilson have sole custody and that Padula-Wilson be limited to supervised visitation. They later testified that the website and videos led them to conclude that Padula-Wilson was actively alienating the children from Wilson, "damaging" them and "poisoning" their relationship with him.

---

[2] The Court of Appeals of Virginia addressed the allegations of abuse in an unpublished opinion. *Padula-Wilson v. Wilson*, Record No. 1203-14-2, 2015 WL 1640934 (April 14, 2015).

In August 2013, Dr. Gasper and Landry testified that Padula-Wilson was delusional, psychotic, and a flight risk, and recommended the children be removed from her custody. On August 20, 2013, the court removed the children from Padula-Wilson and denied her visitation. In March 2014, the custody court permitted supervised visitation between Padula-Wilson and the children.

Later, the court entered a June 2014 final order awarding sole legal and physical custody of the children to Wilson. The order also provided that Padula-Wilson would "continue to have visitation based on the recommendations of Dr. Michele Nelson." It clarified that Padula-Wilson "shall only have unsupervised visitation with the children when and if Dr. Nelson determines that it is appropriate or determines any alternatives that are in the best interests of the children." The circuit court also mandated that A.W. continue therapy with Campanella, "who shall coordinate with Dr. Nelson regarding [A.W.]'s visitation with the [mother]." *See Padula-Wilson v. Wilson*, Record No. 1203-14-2, 2015 WL 1640934 (April 14, 2015). Padula-Wilson subsequently appealed from the June 2014 order, raising several issues. The Court of Appeals of Virginia affirmed the judgment in part, reversed in part, and remanded the action. With respect to the custody and visitation order, the Court of Appeals concluded that the circuit court erred in delegating its judicial authority to Dr. Nelson and Campanella. *Id.*

Ultimately, in March 2017, the circuit court entered an order granting both parents joint legal and physical custody over C.W. and A.G.W.

II.     THE COMPLAINT.

In 2017, Padula-Wilson, an attorney acting pro se, filed a multi-count complaint spanning 66 pages and 276 paragraphs, along with exhibits. Only two counts are relevant to the issues

3

before us.[3]  She alleged tortious interference with parental rights and defamation.  She sought $16,000,000 in compensatory damages from the various defendants and Wilson (who was not a named defendant) and $350,000 in punitive damages from each of Landry, Dr. Nelson, Dr. Gasper, Wert, and Campanella, plus costs, attorney's fees, and interest.

A.    Allegations of tortious interference with parental rights.

Padula-Wilson alleged that Landry, Dr. Gasper, Dr. Nelson, Wert, and Campanella intentionally interfered with her parental rights by removing her children from her and by causing her to have no contact with any of the three children from August 2013 through March 2014, only limited or supervised visitation with two children from March 2014 through March 2017, and no contact with the third child from August 2013 through March 2017, except for two months of supervised visitation in early 2014.

Padula-Wilson alleged that Landry acted maliciously and in bad faith, colluding with the co-defendants; made false statements about her to mental health professionals and police officers; suppressed evidence of Wilson's physical abuse; exceeded the scope of his appointment as guardian ad litem and breached the standards for guardians ad litem promulgated by the Virginia State Bar; made false statements about her in and out of court; entered her home without permission while she was on vacation; and allowed Wilson to take the children to visit a convicted pedophile.

Padula-Wilson alleged similar conduct by Dr. Gasper, substituting the standards of the American Psychological Association for those of the Virginia State Bar.  She further alleged that

---

[3] Padula-Wilson also alleged claims of intentional and negligent infliction of emotional distress, improper disclosure of confidential medical information, and negligent retention.  The Circuit Court granted demurrers as to those claims in December of 2018, and those claims are not currently before us.

4

Dr. Gasper exceeded the scope of her appointment as a reunification counsellor for C.W. and Wilson; that she purported to diagnose Padula-Wilson, who was not her patient; and that she improperly disclosed confidential medical information.

With respect to Wert, Padula-Wilson alleged similar conduct, adding allegations that this defendant suppressed information about C.W.'s 9-1-1 call and that she acted vindictively after she learned that Padula-Wilson was representing a plaintiff in a $6,000,000 wrongful death action against her.

Padula-Wilson alleged similar conduct by Dr. Nelson, but she also alleged that Dr. Nelson used the authority of the custody court's original order delegating visitation decisions to her, later reversed by the Court of Appeals, to deny Padula-Wilson contact with the children after she learned that Padula-Wilson was representing a plaintiff in a $6,000,000 wrongful death action against her.

Padula-Wilson alleged conduct by Campanella similar to that of Dr. Gasper, adding the allegation that Campanella failed to diagnose or treat A.W.'s Asperger's syndrome.

Finally, Padula-Wilson alleged that Forensic was vicariously liable for Dr. Nelson's acts and that Westwood was vicariously liable for the actions of Wert and Campanella.

B.     Allegations of defamation.

In a separate count, Padula-Wilson alleged defamation by Dr. Nelson[4] based on specific statements contained in emails Dr. Nelson generated in connection with her work in the custody case. The specific statements are set forth in Part II of this opinion.

---

[4] Padula-Wilson also alleged defamation by Campanella and Wert, and vicarious liability by Westwood in that connection. The Circuit Court granted demurrers as to those claims in December of 2018, and they are also not before us. The assignment of error singles out Dr. Nelson exclusively.

C.      The Circuit Court grants the defendants' demurrers.

The defendants filed demurrers in response to the complaint. The circuit court granted the demurrers and dismissed the complaint. First, on the tortious interference with parental rights count, the circuit court ruled that the tort did not apply under the facts of this case. The circuit court concluded that extending the tort to cases like this one would open the door to every parent on the losing side of a custody or visitation case to sue the prevailing parent's witnesses, alleging that their testimony was false.

Second, the circuit court opined that even if any of the defendants had testified falsely, Padula-Wilson had the opportunity to expose that falsity through cross-examination during the in-court proceedings that led to the custody and visitation orders. Her due process rights therefore were not violated. Further, the custody and visitation decisions were made by the custody court, not the defendants, so the complaint could not allege that they were the proximate cause of any interference with her parental rights. Moreover, although Padula-Wilson's visitation and contact may have been limited for a time, the final order awarded her joint legal and physical custody, so there was no harm. In addition, relying on *Briscoe v. LaHue*, 460 U.S. 325 (1983), and *Watt v. McKelvie*, 219 Va. 645 (1978), the circuit court ruled that there is absolute judicial privilege for statements made in the course of judicial proceedings, which extends beyond a witness's in-court testimony. The defendants therefore were all absolutely immune from liability on this claim.

On the defamation count, the court ruled that both qualified privilege and absolute judicial privilege applied.

The court thereafter entered a final order incorporating its rulings from the bench.

6

Padula-Wilson appeals. We granted the following assignments of error:[5]

> 1. The Circuit Court erred when it granted all the Defendants demurrers and dismissed the tortious interference of parental rights claims and when it ruled that a) the tort does not exist under the fact pattern in this case b) there was absolute immunity for all of the Defendants because their out-of-court actions were in the course of judicial proceedings and c) a court ultimately made custody and visitation decisions even if the Defendants made the decisions over years, and so there was due process, no causal relationship, and no harm.

> 2. The Circuit Court erred when it granted Nelson's demurrer and dismissed the defamation claims and when it ruled that her statements in emails were subject to privilege and immunity.

## ANALYSIS

I. THE TORT OF INTERFERENCE WITH PARENTAL RIGHTS DOES NOT EXTEND TO THE FACTS ALLEGED BY THE PLAINTIFF.

In reviewing a circuit court's decision to grant a demurrer, "we accept as true all properly pled facts and all inferences fairly drawn from those facts." *Augusta Mut. Ins. Co. v. Mason*, 274 Va. 199, 204 (2007). This Court reviews the sustaining of a demurrer de novo. *Crosby v. ALG Tr., LLC*, 296 Va. 561, 567 (2018).

In *Wyatt v. McDermott*, 283 Va. 685 (2012), we held that Virginia law recognizes tortious interference with parental rights as a cause of action. We grounded our decision on the recognition by the English common law, as well as various courts throughout the United States, of "the essential value of protecting a parent's right to form a relationship with his or her child." *Id.* at 692. Given the existence of this right, we reasoned "that the common law right to establish and maintain a relationship with one's child necessarily implies a cause of action for interference with that right." *Id.* at 693. "To hold otherwise in this case would be to recognize a right

---

[5] We also granted Padula-Wilson's assignment of error addressing the dismissal of her negligent retention claim. She has withdrawn that assignment of error.

7

without a remedy." *Id.* Put another way, "rejecting tortious interference with parental rights as a legitimate cause of action would leave a substantial gap in the legal protection afforded to the parent-child relationship." *Id.* at 692.

In *Wyatt*, the alleged facts were "astonishing and profoundly disturbing." *Id.* at 703. A biological mother and her parents, with the aid of two licensed attorneys and an adoption agency, had conspired to prevent the biological father "from legally establishing his parental rights and gaining custody of a child whom the mother did not want to keep." *Id.* The mother repeatedly assured the father that they were going to raise the child, lied on adoption forms regarding the father's address, and did not inform the father of the adoption proceedings. *Id.* at 690. In other words, the biological mother, her parents, and two attorneys deceptively caused the child to be adopted by a family in a location far away without the consent or knowledge of the biological father. Without the tort of interference with parental rights, the father would have had no remedy for the wrong done to him.

In order to state a claim for tortious interference of parental rights, a plaintiff must plead sufficient facts to show that:

> (1) the complaining parent has a right to establish or maintain a parental or custodial relationship with his/her minor child; (2) a party outside of the relationship between the complaining parent and his/her child intentionally interfered with the complaining parent's parental or custodial relationship with his/her child by removing or detaining the child from returning to the complaining parent, without that parent's consent, or by otherwise preventing the complaining parent from exercising his/her parental or custodial rights; (3) the outside party's intentional interference caused harm to the complaining parent's parental or custodial relationship with his/her child; and (4) damages resulted from such interference.

8

*Id.* at 699. Furthermore, these elements "presuppose not merely any interference of any kind, but rather, a tortious interference . . . ." *Coward v. Wellmont Health System*, 295 Va. 351, 360 (2018).

In *Coward*, we took the opportunity to clarify the scope of this tort. In that case, a mother agreed to put her child up for adoption. She, and the biological father, signed an adoption agreement and a petition and agreed order under circumstances that did not indicate she was "coerced" in any way. *Id.* at 355-57. The juvenile and domestic relations court later entered the order. *Id.* at 357. Less than two weeks after entry of the order, the mother changed her mind about placing the child up for adoption. *Id.* She then filed suit against various defendants, including the adoptive parents of the child, alleging, among other things, intentional interference with parental rights. *Id.*

This Court affirmed the circuit court's grant of a demurrer in *Coward*. We concluded that liability arises only when the tortfeasor has interfered with parental rights "*with knowledge that the parent does not consent.*" *Id.* at 361. The complaint in that case lacked factual assertions against most of the defendants that they interfered with the mother's parental rights with either knowledge that the mother did not consent or knowledge that the "child [was] away from home against the will of [the mother]," *Id.* at 365.

We also made clear that the tort of intentional interference with parental rights applies only to a tortious interference "as that concept is summarized both in the text of and the comments to the Restatement." *Coward*, 295 Va. at 360. Restatement (Second) of Torts § 700 (1997) states:

> One who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent.

9

The facts alleged in the present case, however, do not resemble an abduction or anything comparable.

Padula-Wilson contends that the circuit court erred by ruling that *Wyatt* does not apply here simply because this is a custody case. She notes that the complaint's allegations included assertions about the defendants' out-of-court actions, including violations of the custody court's orders.

We conclude that the tort of interference with parental rights should not be extended to the allegations made by Padula-Wilson. First, unlike the facts in *Wyatt*, where tortious interference with a father's rights was the sole recourse for the wrong done to a father's parental rights, the backdrop of Padula-Wilson's claim is a custody and visitation proceeding. During the course of that proceeding, she was afforded ample due process. *Cf. Wyatt*, 283 Va. at 693 ("When a parent has been unduly separated from a child by a third party for a substantial period of time *without due process of law* . . . legitimate harms may be suffered that are properly recoverable in tort." (emphasis added)). Padula-Wilson's custody and visitation rights were adjudicated over the course of multiple hearings, accompanied by opportunities to call for evidence in her favor, cross-examine witnesses, seek redress for alleged violations of court orders, and the opportunity, partially successful in her case, to appeal adverse rulings. Moreover, as a further mechanism for deterrence and enforcement, the General Assembly has enacted Code § 18.2-49.1, which provides in relevant part:

> Any person who knowingly, wrongfully and intentionally withholds a child from either of a child's parents or other legal guardian in a clear and significant violation of a court order respecting the custody or visitation of such child, provided such child is withheld outside of the Commonwealth, is guilty of a Class 6 felony.

In this case, Padula-Wilson alleges that some of the defendants lied out of court in connection with the case, and lied to the court. The veracity of witness testimony in the context of a court proceeding is ordinarily addressed in the "crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656 (1984) – not in collateral proceedings at the conclusion of a case. The "conspired" and allegedly false opinions that form the basis of plaintiff's claim for tortious interference of parental rights were presented in open court, subject to cross-examination, rebuttal, and weighing by the trial judge.

Padula-Wilson further argues that the defendants violated court orders in selecting mental health professionals without her approval and in refusing to permit her visitation in violation of a court order. She also alleges the defendants conspired to prevent her from seeing her children, in violation of a court order which granted her supervised contact. If the defendants were violating a court order, Padula-Wilson could have availed herself of contempt and other remedies to correct the problem, by alerting the court that its order was being violated and asking for that violation to be remedied.

The fact that some of the alleged conduct took place outside of the courtroom does not change the answer. First, it is hardly surprising that mental health professionals and a guardian ad litem should communicate and share their impressions to reach an appropriate recommendation to the court. There is nothing "conspiratorial" or improper about such conduct. Second, none of the defendants physically took any of the children away. It is their in-court testimony and recommendations, subject to adversarial testing and to the presentation of opposing evidence, that resulted in the court entering a specific order of custody or visitation.

In addition, this case does not involve an action "by the parent who is entitled to the custody of a minor child against one who by force abducts the child from its home, or one who

11

induces the child to leave its home with knowledge that the parent has not consented." Restatement (Second) of Torts § 700 cmt. a. Which parent was entitled to custody of the children was at the heart of the then-pending custody and visitation case, and it was adjudicated in a series of hearings and orders.

Divorce and custody cases inherently involve enough frustration, heartache, stress, and expense. We decline to expand the scope of the tort of interference with parental rights by opening a new front for disappointed, angry, frustrated, or vindictive parents to renew battle.

In addition, dragging mental health professionals and guardians ad litem into court for their role in a custody and visitation case would be highly detrimental to the process. In *Wyatt*, where we set forth the elements of the tort, we found persuasive a decision of the West Virginia Supreme Court of Appeals, *Kessel v. Leavitt*, 511 S.E.2d 720 (W.Va. 1998). In *Wilson v. Bernet*, 625 S.E.2d 706 (W.Va. 2005), the same Court held "no cause of action for tortious interference with [the] parental or custodial relationship may be maintained against an adverse expert witness based upon his/her expert testimony and/or participation in a child custody and visitation proceeding." 625 S.E.2d at 714. We similarly conclude that no cause of action for tortious interference with a parental or custodial relationship may be maintained against a guardian ad litem or an adverse expert witness based upon his/her expert testimony and/or participation in a child custody and visitation proceeding. In short, the allegations made in the complaint in this case do not give rise to a cause of action for tortious interference with parental rights. Therefore, the circuit court properly granted the defendants' demurrers.

II.   THE CIRCUIT COURT PROPERLY DISMISSED THE DEFAMATION CLAIMS AGAINST DR. NELSON.

The circuit court dismissed the defamation claim against Dr. Nelson on the ground that her statements were protected by qualified privilege and absolute judicial privilege. We affirm

12

the judgment dismissing that claim, albeit on different grounds. Where a circuit court is right for a different reason that was fully ventilated in the proceedings, we will affirm the judgment below. *See Rickman v. Commonwealth*, 294 Va. 531, 542 (2017).

In her demurrer, Dr. Nelson argued that the statements Padula-Wilson identified in the complaint were not defamatory because they constituted statements of opinion. "It is firmly established that pure expressions of opinion are protected by both the First Amendment to the Federal Constitution and Article I, Section 12 of the Constitution of Virginia and, therefore, cannot form the basis of a defamation action." *Williams v. Garraghty*, 249 Va. 224, 233 (1995). "Whether an alleged defamatory statement is one of fact or of opinion is a question of law." *Raytheon Technical Servs. Co. v. Hyland*, 273 Va. 292, 303 (2007). "[A] court must consider the statement as a whole." *Lewis v. Kei*, 281 Va. 715, 725 (2011) (quoting *Hyland v. Raytheon Technical Servs. Co.*, 277 Va. 40, 47 (2009)).

For example, the statement "Cynthia is frequently verbose and vocal in her opinions, to a degree that others stop participating in open dialogue" is a statement of opinion. *Hyland*, 273 Va. at 305. Similarly, the following statement is also one of opinion: "She has received specific feedback from her customers, the Beacon group study, her employees, and her leader on her need to listen and learn from others, yet she has appeared to be unwilling to accept and work with this feedback." *Id.* A statement that an architect is "inexperienced" or his fees are excessive is similarly a statement of opinion. *Chaves v. Johnson*, 230 Va. 112, 118-19 (1985).

The following specific statements, made by Dr. Nelson in emails, are at issue:

- "I was concerned about what I understood about [Padula-Wilson's] role in that interaction, so no contact of any sort is authorized for her with A.W. in May 2015."

13

- "Specifically, there are concerns that C.W.'s deterioration has at least been contributed to by information his mother has discussed with him" and "I understand that [Padula-Wilson] and A.W. had another brief interaction recently. Given his reactions the last two times he has seen her, and the impact of those interactions on him, I do not authorize any contact between them for June 2015." (internal alteration omitted).

- "I do not authorize overnight visits or additional visitation for this month. I remain concerned about the tone of [Padula-Wilson's] e-mails regarding coparenting and her boundaries with the children. It was inappropriate of her to discuss this with the children before the father" and "I do not authorize her taking the children today or in the future. It is unfortunate, but the attitudes inherent in her intended actions, at least based on the writings provided to me, are not in the children's best interest."

- Nelson had "ongoing concerns about Ms. Wilson's boundaries with the children."

- "[Padula-Wilson] has kept [her] children overnight . . . without communicating her specific intentions appropriately to Mr. Wilson, and has shared inappropriate information about the custody proceedings with the children. Further, within this past month she has also apparently spoken directly with the children about not trusting their therapists, made comments to the children suggesting the children are not safe with their therapists, and discussed negative things about their father with them . . . it appears that the tone of her communications with them has become problematic, her lack of boundaries with them is a risk factor to them . . . . Therefore, I do not authorize any time with [Padula-Wilson] and any of the three Wilson children." (ellipses in original) (internal alteration omitted).

    Several of the statements are merely directives or expressions of what Dr. Nelson intended to do; they do not directly address Padula-Wilson at all. Those that cast Padula-Wilson

in a negative light—i.e., that Dr. Nelson had "concerns" about her behavior, or whether her behavior or statements were "appropriate," "inappropriate," or "negative"—are merely expressions of opinion and therefore are not actionable. "When a statement is relative in nature and depends largely on a speaker's viewpoint, that statement is an expression of opinion." *Hyland.*, 277 Va. at 47. *See also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (speech that does not contain a provably false factual connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person, are not actionable). We recognize that "[f]actual statements made to support or justify an opinion . . . can form the basis of an action for defamation." *Williams*, 249 Va. at 233. Here, the context and general tenor of Dr. Nelson's statements contained constitutionally protected subjective views. And "opinions fully disclosing their factual bases constitute a subjective view and are not actionable." *Biospherics, Inc. v. Forbes*, 151 F.3d 180, 184-85 (4th Cir. 1998). Taken as a whole, the statements Padula-Wilson complains about are inactionable statements of opinion. Consequently, we affirm on an alternate basis the circuit court's dismissal of the defamation claims made against Dr. Nelson.

## CONCLUSION

The judgment of the circuit court is affirmed.

*Affirmed.*

15