# Richmond

OCEAN VIEW IMPROVEMENT CORPORATION v. NORFOLK AND WESTERN RAILWAY COMPANY.

March 8, 1965.

Record No. 5862.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, l'Anson and Carrico, JJ.

*Stanley E. Sacks* (*Charles N. Cooper; Sacks, Sacks & Kendall; Cooper & Cooper*, on brief), for the plaintiff in error.

*Lawson Worrell, Jr.* and *Thomas R. McNamara* (*Williams, Cocke, Worrell & Kelly*, on brief) for the defendant in error.

SNEAD, J., delivered the opinion of the court.

On May 17, 1962, Ocean View Improvement Corporation, plaintiff, filed a motion for judgment against Norfolk and Western Railway Company, defendant. The motion alleged that on February 26, 1958, defendant negligently delayed, at its railway crossing on Granby street[1], certain Norfolk fire apparatus that was proceeding to a fire at plaintiff's place of business, which delay proximately caused the fire to get out of control and resulted in property damage to plaintiff in the sum of $398,521.37. At the conclusion of plaintiff's evidence, the trial court sustained defendant's motion to strike plaintiff's evidence and entered summary judgment for defendant. We awarded plaintiff a writ of error.

The plaintiff was the owner and operator of Ocean View Amusement Park which was located between Ocean View avenue and the Chesapeake Bay at the northern end of Granby street in Norfolk. Granby street runs north and south; Ocean View avenue runs east and west. Hence, the intersection of Granby street and Ocean View avenue forms the letter "T". The plaintiff's facilities consisted of ten buildings or structures. They all faced Chesapeake Bay with the exception of the roller coaster which was located on Ocean View avenue. Norfolk and Western Railway Company owns railroad tracks which run generally in an east-west direction and cross Granby street at grade about three miles south of plaintiff's amusement park in an area known as Wards Corner.

On February 26, 1958, a fire developed in the merry-go-round building of the amusement park and the first alarm was given at 6:25 p.m. Personnel from five Norfolk fire companies responded with a total of four pieces of fire fighting equipment and a salvage truck. Two of the companies were stationed close by and they dispatched two pumpers and a hook and ladder which appeared at the scene in about one minute after the alarm sounded. Some of the equipment came from Thole street station and had to cross defendant's tracks on Granby street. The crossing was not blocked and it arrived in a matter of minutes. None of the equipment which responded to the first alarm was delayed in any manner. Chief J. L. Ballard, who answered the first alarm, testified:

---

[1] At the time in question the tracks were owned by The Virginian Railway Company and its trains were involved. Prior to the institution of this action The Virginian Railway Company merged with Norfolk and Western Railway Company.

"Q. All right, sir. Now, then, when you arrived at that fire can you describe its condition to us?

"A. It was a lot of fire there and in my opinion it was out of control.

\* \* \* \* \*

"Q. Chief, limiting opinions, then, I just want you to describe the nature of the fire. Was it entirely inside the building so that you could just see it through a window somewhere or was it outside?

"A. It was outside of the building. It was coming through the windows and leaping over the top of the roof and it possibly—I couldn't tell whether part of the roof had fallen in or not, but I know the flames were leaping much higher than the roof when I arrived.

"Q. Now, did that condition progress or recede?

"A. It progressed.

"Q. In what direction?

"A. West.

"A. West and south, I should say, because it caught the Leap the Dip.

"Q. Well, were your forces hampered in their fighting the fire by any physical factors, weather conditions or any other factors?

"A. Well, the weather conditions, the velocity of the wind that was blowing tended to spread it extremely fast, and the nature of the material that was being consumed, being dry lumber, tended to accelerate the spread of the fire, and as far as—

"Q. Was this accessible to the buildings?

"A. No, it wasn't. We were greatly hampered by the chain link fence."

A second alarm was sounded by Captain R. F. Joyner at 6:26 p.m., one minute after the first alarm. He observed the magnitude of the fire just before he reached it while answering the first alarm and decided that help was needed. His alarm alerted three additional fire companies, and three pieces of equipment proceeded immediately toward the scene of the fire. When two of the vehicles arrived at the crossing on Granby street at Wards Corner they were compelled to stop because defendant's automatic gates were down and a train was crossing the street. Captain H. M. Boggs stated that his fire truck was delayed for the length of time it required the train to pass over the crossing, and J. T. Pierce said that his fire truck was delayed for a maximum of two minutes.

A third alarm was given at 6:34 p.m., and each of two companies

dispatched a pumper. It took these vehicles about five minutes to reach Granby street crossing. The gates were down and a train was crossing Granby street. The captains estimated that their trucks were delayed at the crossing approximately five minutes.

Three officials of plaintiff corporation, who were proceeding to the fire scene, testified in effect that about 6:30 p.m. the crossing was continuously blocked by the gates and a passing train up to a period of fifteen minutes. During this interval they observed certain fire equipment also delayed at the crossing.

Dudley Cooper, one of plaintiff's officials who were blocked at the crossing, stated that he arrived at the fire scene about 6:55 p.m.; that only the merry-go-round building was burning; that "there was only a couple of streams going on that fire at the time"; that he observed this building burn for fifteen minutes before the fire spread southwestwardly and ultimately burned six additional buildings or structures belonging to plaintiff.

There was no evidence of a standing train at the crossing. The official records of the railroad introduced by plaintiff show that two trains moved along the Granby street crossing during the time in question. The first train was outbound and departed defendant's marshalling yards at Sewells Point, which is about two miles west of the crossing, at 6:25 p.m. It was about 7500 feet long and passed over the crossing at a speed of 20 to 25 miles per hour.

The second train was about 7100 feet in length and was proceeding westerly or inbound towards Sewells Point at a speed of approximately 20 miles per hour when it crossed Granby street. It passed the first train in the vicinity of Simpson's curve, which begins about 4,000 feet east of the crossing. The defendant's records disclose that the inbound train had crossed Granby street and stopped at Camp Allen at 6:35 p.m.

It is not clear from the evidence whether the automatic gates opened between the time the first and second trains passed over the crossing. In the view we take of the case this is immaterial, and we may assume for the purposes of this opinion that defendant's moving trains obstructed the Granby street crossing continuously for a period of fifteen minutes.

The trial court struck plaintiff's evidence on the ground that, assuming defendant was negligent, there was no showing of proximate cause. Having reached this conclusion the court did not consider it necessary to decide whether § 27-86 of Norfolk City Code

1950, *infra,* which limits obstruction time at grade crossings, applied to moving trains.

Here, plaintiff does not contend that there was any common law negligence on the part of defendant. Indeed, the record is devoid of evidence showing any such negligence. However, plaintiff maintains that there was ample evidence to show that defendant obstructed its crossing on Granby street in violation of a Norfolk city ordinance (§ 27-86) which constituted negligence *per se* and that whether such negligence was the proximate cause of its damages should have been submitted to the jury.

On the other hand, defendant takes the position that there was no evidence that the ordinance was violated because it applied only to standing trains and that even if the ordinance did apply to moving trains the evidence failed to show proximate cause.

Section 27-86 of Norfolk City Code, 1950, provided in part:

"Between the hours of 6:00 A.M. and 12:00 midnight following * * * the crossing at grade of any public street or avenue in any part of the city * * * *shall not be obstructed by a locomotive engine, car or train* for more than eight minutes at any one time, and if any such crossing is obstructed for said period of eight minutes between said hours, there shall be immediately an interval of at least five minutes before said crossing is again obstructed * * *. (Italics supplied.)

\* \* \* \* \*

"For a violation of this section the railroad company * * * shall be subject to a fine in any sum not more than fifty dollars for each offense."

The dominant question presented is whether the prohibited obstruction under the ordinance applies to a moving train. If not, it is manifest that no actionable negligence has been established.

The plaintiff cites no case, nor have we found one, in which it has been held that a moving train obstructed a crossing in violation of a city ordinance. An examination of the authorities discloses that many of the statutes or ordinances which regulate the time that a railroad may obstruct a crossing expressly include the words "remain standing", "stand on or across", or words of similar import. See *Houren* v. *Chicago, M. & St. P. Ry. Co.,* 236 Ill. 620, 86 N.E. 611; *Cleveland, C., C. & St. L. Ry. Co.* v. *Tauer,* 176 Ind. 621, 96 N.E. 758; *Cleveland, C., C. & St. L. Ry. Co.* v. *Gillespie,* 96 Ind. App. 535, 173 N.E. 708; *Tyler* v. *Chicago & Eastern Illinois Railway,* 241 Ind. 463, 173 N.E. 2d 314; *Missouri-Kansas-Texas R. Co.* v. *Neuhoff*

*Bros.*, Tex. Civ. App., 297 S.W. 2d 316; *Mlenek* v. *Fleming*, 224 Minn. 38, 27 N.W. 2d 800; *Walker* v. *Missouri Pac. Ry. Co.*, 95 Kan. 702, 149 P. 677.

It is evident from a careful consideration of the ordinance that it does not apply to moving trains. The ordinance refers to "a locomotive engine, car or train", and the word "moving" does not appear anywhere therein. Certainly, a single moving locomotive engine or car could not possibly obstruct a railroad crossing for a period in excess of eight minutes regardless of speed. Since the ordinance has reference to a standing locomotive or car, we think that it also contemplates a standing train.

Moreover, there is another reason why we feel constrained to interpret the ordinance as applicable only to standing trains. If it were construed to apply to moving trains, the ordinance, in effect, would or could limit the length of a train and thereby unreasonably hinder the free flow of commerce between the states in contravention of the commerce clause of the Federal Constitution. (Article 1, § 8)

In *Kahn* v. *Southern Ry. Co.*, 202 F. 2d 875 there were two city ordinances involved. The first ordinance provided in part: "Any corporation, conductor, engineer, or other employee of any steam railroad company having tracks running across the public streets of this city, who shall obstruct the same, or prevent the free passage of vehicles and pedestrians longer than three minutes at one time, shall be subject to a penalty." The second ordinance limited the speed of trains "along, through or across any street" in the city to 4 miles per hour. Defendant's train was stopped on a crossing for two minutes and then proceeded to move over the crossing at a speed of 4 to 6 miles per hour. Its movement consumed approximately twenty minutes and prevented certain fire apparatus from reaching the scene of plaintiff's fire. The court construed the two ordinances together and said:

"It is also true that the passing train obstructed the street longer than the period of three minutes prescribed by Ordinance No. 537; but we think that this provision must be interpreted as applying to trains standing still in the body of the street and not to trains moving on the railroad's right of way. * * *

"If, on the other hand, Ordinance No. 537 was intended to apply to moving trains then, in our opinion, the ordinance must be held to be invalid as contravening the commerce clause of the Federal Constitution. * * *

"* * * No additional evidence is needed to show that the ordinances so construed come within the condemnation of the following passage from Southern Pacific Co. v. Arizona, 325 U.S. 761, at page 775, 65 S. Ct. 1515, at page 1523:

" 'If one state may regulate train lengths, so may all the others, and they need not prescribe the same maximum limitation. The practical effect of such regulation is to control train operations beyond the boundaries of the state exacting it because of the necessity of breaking up and reassembling long trains at the nearest terminal points before entering and after leaving the regulating state. The serious impediment to the free flow of commerce by the local regulation of train lengths and the practical necessity that such regulation, if any, must be prescribed by a single body having a nation-wide authority are apparent.' " 202 F. 2d at pp. 878, 879.

There is a well recognized canon of construction that when a statute or an ordinance is susceptible of two constructions, one of which is within the legislative power and the other without, the courts are required to adopt the former construction. *Adams Express Co.* v. *Charlottesville Woolen Mills*, 109 Va. 1, 5, 63 S.E. 8; *Bourne* v. *Board of Supervisors*, 161 Va. 678, 684, 685, 172 S.E. 245; 17 M.J., Statutes, § 30, p. 277. In applying this rule we hold that the ordinance in question applies to standing trains and not to moving trains. Thus, defendant did not violate the ordinance as contended, and no actionable negligence was shown.

Since we hold that defendant was not guilty of negligence, the question of proximate cause becomes moot. However, upon a consideration of the entire record, we find that the evidence adduced relating to proximate cause was too speculative and lacked sufficient probative value to sustain a verdict.

For the reasons stated, the judgment appealed from is

*Affirmed.*