PRESENT: Kinser, C.J., Lemons, Goodwyn, Millette, Mims, and Powell, JJ., and Russell, S.J.

L.F., A MINOR

v.   Record No. 120158

OPINION BY
WILLIAM D. BREIT, ET AL.          JUSTICE WILLIAM C. MIMS
                                         January 10, 2013

BEVERLEY MASON

v.   Record No. 120159

WILLIAM D. BREIT, ET AL.

FROM THE COURT OF APPEALS OF VIRGINIA

In these appeals, we consider whether Code §§ 20-158(A)(3) and 32.1-257(D) bar an unmarried, biological father from establishing legal parentage of his child conceived through assisted conception, pursuant to a voluntary written agreement as authorized by Code § 20-49.1(B)(2).

I.   BACKGROUND AND MATERIAL PROCEEDINGS BELOW

Beverley Mason and William D. Breit had a long-term relationship and lived together as an unmarried couple for several years.  They wished to have a child together.  Unable to conceive naturally, they sought reproductive assistance from Dr. Jill Flood, a board-certified fertility doctor.

Dr. Flood performed two cycles of in vitro fertilization ("assisted conception").  Each time, she retrieved eggs from Mason, fertilized them outside her body using Breit's sperm, and transferred the resulting embryos into Mason's body.  Breit

was present for all stages of the in vitro fertilization process and continued to live with Mason throughout the resulting pregnancy.

Prior to the child's birth, Mason and Breit entered into a written custody and visitation agreement providing Breit with reasonable visitation rights and agreeing that such visitation was in the child's best interests.

On July 13, 2009, Mason gave birth to L.F. Breit was present for L.F.'s birth and is listed as the father on her birth certificate. The couple named her after Mason's paternal grandmother and Breit's maternal grandmother, and her last name is a hyphenated combination of their surnames.

On the day after L.F.'s birth, Mason and Breit jointly executed a written agreement, identified as an "Acknowledgement of Paternity," stating that Breit is L.F.'s legal and biological father.[1] The couple jointly mailed birth announcements naming Mason and Breit as L.F.'s parents. They stated to friends and family that Breit was L.F.'s father, and continued to live together for four months following L.F.'s birth.

------

[1] Mason and Breit used the acknowledgement of paternity form promulgated by the Virginia Department of Health, Division of Vital Records, pursuant to Code § 32.1-257(D).

After the couple separated, Breit continued to provide for L.F. financially.  He maintained her as his child on his health insurance policy and continued to provide child support.  He consistently visited L.F. on weekends and holidays, thereby beginning to establish an ongoing parent-child relationship with her.  Breit took an active role in L.F.'s life until August 2010, when Mason unilaterally terminated all contact between Breit and L.F.

On August 24, 2010, Breit filed a petition for custody and visitation in the Juvenile and Domestic Relations District Court of the City of Virginia Beach.  Mason filed a motion to dismiss and the court dismissed Breit's petition without prejudice.  In November 2010, pursuant to Code § 20-49.2, Breit filed a petition to determine parentage and establish custody and visitation ("petition to determine parentage") in the Circuit Court of the City of Virginia Beach, naming Mason and L.F. (collectively "Mason") as co-parties defendant.  He filed a motion for summary judgment, arguing that the acknowledgement of paternity that he and Mason voluntarily executed pursuant to Code § 20-49.1(B)(2) created a final and binding parent-child legal status between Breit and L.F.  Mason filed pleas in bar asserting that, pursuant to Code §§ 20-158(A)(3) and 32.1-257(D), Breit was barred from being L.F.'s legal parent because

he and Mason were never married and L.F. was conceived through assisted conception.

At the hearing on the motions, the circuit court appointed Jerrold Weinberg, an attorney who previously had been retained by Mason to represent L.F., to serve as L.F.'s guardian ad litem ("GAL").  The circuit court sustained the pleas in bar, denied Breit's motion for summary judgment, and dismissed by nonsuit the remainder of Breit's petition seeking custody and visitation.  Breit appealed the circuit court's judgment to the Court of Appeals.

The Court of Appeals reversed the circuit court's decision to sustain the pleas in bar.  Breit v. Mason, 59 Va. App. 322, 337-38, 718 S.E.2d 482, 489 (2011).  It held that

> a known sperm donor who, at the request of a woman to whom he is not married, donates his sperm for the purpose of uniting that sperm with that woman's egg to accomplish pregnancy through assisted conception and who, together with the biological mother, executes an uncontested Acknowledgement of Paternity under oath, pursuant to Code § 20-49.1(B)(2), is not barred from filing a parentage action pursuant to Code § 20-49.2 to establish paternity of the child resulting from assisted conception.

Id. at 337, 718 S.E.2d at 489.

In reaching its decision, the Court of Appeals "harmonized" Code §§ 20-49.1(B)(2) and 20-158(A)(3) to be consistent with "the intent of the legislature to ensure that all children born in the Commonwealth have a known legal mother

4

and legal father." Id. at 336-37, 718 S.E.2d at 489. The Court of Appeals concluded that it would create a "manifest absurdity" to interpret Code § 20-158(A)(3) to foreclose any legal means for an intended, unmarried, biological father to establish legal parentage of a child born as a result of assisted conception, merely by virtue of his status as a "donor."[2] Id. at 336, 718 S.E.2d at 489. Mason appealed, and we granted the following assignments of error:

> 1. The Court of Appeals erred in rejecting the circuit court's decision that a sperm donor who is unmarried to the mother of a child conceived by "assisted conception" is not the child's father under Va. Code §§ 20-158(A)(3) and 32.1-257(D), and in overturning the circuit court's ruling sustaining the pleas in bar.

> . . . .

> 2. The Court of Appeals erred in failing to rule that donor's acknowledgement of paternity was void *ab initio* and ineffective and that donor lacked any proper basis for asserting parentage.[3]

We also granted Breit's assignments of cross-error:

> 1. The Court of Appeals erred in failing to reverse the trial court for failing to enter summary judgment in favor of the father pursuant to § 20-49.1(B)(2) when the birth mother voluntarily signed an "acknowledgement of paternity" under oath acknowledging the biological father to be the legal father of the child.

---

[2] The Court of Appeals also held that the circuit court erred in appointing Weinberg as L.F.'s GAL and directed the trial court to appoint a new GAL for L.F. on remand.

[3] The listed assignments of error are verbatim from Record No. 120159. The assignments of error in Record No. 120158 have slightly different wording but are substantively identical.

2. The Court of Appeals erred in failing to rule that § 20-158(A)(3) and § 32.1-257(D) are unconstitutional and that any statutory interpretation that fully and finally terminates any potential rights of a sperm donor violates the constitutionally protected liberty rights of equal protection and due process.

## II.  LEGISLATIVE HISTORY AND POLICY

Before we analyze the issues in this case, it is helpful to review the legislative history and policy behind the two primary statutes.

### A. TITLE 20, CHAPTER 3.1 (CODE § 20-49.1 et seq.)

Code § 20-49.1 et seq. is the statutory scheme designed to establish the legal parentage of children born to unmarried parents.

At common law, there was no recognized duty on the part of an unmarried father to support his biological child.  See Brown v. Brown, 183 Va. 353, 355, 32 S.E.2d 79, 80 (1944).  The first statutory modification of the common-law rule occurred in 1952, when the General Assembly allowed proof of paternity to establish such a duty, but only by the father's admission of paternity under oath before a court.  1952 Acts ch. 584 (formerly codified as Code § 20-61.1).  In 1954, this statute was liberalized to allow proof of paternity through the use of a father's out-of-court admission of paternity in writing under oath.  1954 Acts ch. 577.  In 1988, Code § 20-61.1 was repealed, and the General Assembly amended and recodified the

6

subject matter in Chapter 3.1, Title 20, Code § 20-49.1 et seq.

1988 Acts ch. 866.

Chapter 3.1 is entitled "Proceedings to Determine Parentage." The provision most pertinent to this case, Code § 20-49.1, is specifically labeled "[h]ow parent and child relationship established." Since its enactment in 1988, Code § 20-49.1 has provided for the establishment of paternity by a voluntary written agreement of the biological father and mother, made under oath, acknowledging paternity. In 1992, it was expanded to permit the establishment of paternity through the use of scientifically reliable genetic testing. 1992 Acts ch. 516. There is no limitation in Chapter 3.1 barring parents who conceive through assisted conception from voluntarily establishing paternity by such a written agreement. Consequently, Code § 20-49.1 et seq., read without referencing other statutes, would control the determination of paternity in all cases concerning children of unwed biological parents who enter into such voluntary written agreements.

B. TITLE 20, CHAPTER 9 (CODE § 20-156 et seq.)

Code § 20-156 et seq. (the "assisted conception statute") is intended to establish legal parentage of children born as a result of assisted conception. Unlike Code § 20-49.1 et seq., it was enacted specifically to protect the interests of married parents.

7

The assisted conception statute was enacted in response to Welborn v. Doe, 10 Va. App. 631, 394 S.E.2d 732 (1990), a case involving a married couple and a third-party sperm donor. In Welborn, the Court of Appeals held that the only sure way for the husband of a gestational mother to secure parental rights, thereby divesting any rights of a third-party donor, was for the husband to adopt the child. Id. at 633, 394 S.E.2d at 733. The court noted the General Assembly's failure to enact legislation terminating the rights of such sperm donors, stating: "[u]ntil such time as the Code is amended to terminate possible parental rights of a sperm donor, only through adoption may the rights of the sperm donor be divested and only through adoption may the rights of Mr. Welborn and the twins born to his wife be as secure as their rights would be in a natural father-child relationship." Id. at 635, 394 S.E.2d at 734.

In 1991, at the next legislative session following Welborn, the General Assembly enacted the assisted conception statute, stating: "[t]he husband of the gestational mother of a child is the child's father" and "[a] donor is not the parent of a child conceived through assisted conception." 1991 Acts ch. 600 (enacting Code § 20-158(A)(2)-(3)). The statute clearly was enacted to ensure that infertile married couples such as the Welborns, referred to as "intended parents" under

8

the statute, were not threatened by parentage claims from third-party donors. The policy goal was to ensure that a married couple could obtain sperm from an outside donor without fear that the donor would claim parental rights.

Code § 20-158(A)(3) was amended in 1997 to embody its current language: "[a] donor is not the parent of a child conceived through assisted conception, <u>unless the donor is the husband of the gestational mother</u>." (Emphasis added.) The amendment addressed situations in which the "donor" is also the husband of the gestational mother and therefore is permitted to establish parentage. In such cases, there is no possibility of interference from outside, third-party donors.

### III. ANALYSIS

#### A. STANDARD OF REVIEW

This appeal presents purely legal questions of statutory and constitutional interpretation which we review de novo. <u>Copeland v. Todd</u>, 282 Va. 183, 193, 715 S.E.2d 11, 16 (2011); <u>Addison v. Jurgelsky</u>, 281 Va. 205, 208, 704 S.E.2d 402, 404 (2011).

#### B. ASSISTED CONCEPTION STATUTE

Mason argues that the Court of Appeals erroneously harmonized the clear language of the assisted conception statute with Code § 20-49.1(B)(2). She claims that the assisted conception statute prevents all unmarried sperm donors

9

from asserting parental rights with respect to children conceived by assisted conception, whether the mother is married or unmarried and without regard to her relationship with the donor.  She argues that when a statute is unambiguous, we must apply the plain meaning of that language without reference to related statutes.  See Carter v. Nelms, 204 Va. 338, 346, 131 S.E.2d 401, 406 (1963).

We disagree with Mason's interpretation of this statute, because her argument ignores a significant provision of the assisted conception statute.  Code § 20-164 states:

> A child whose status as a child is declared or negated by this chapter [chapter 9] is the child only of his parent or parents as determined under this chapter, Title 64.1, and, when applicable, Chapter 3.1 (§ 20-49.1 et seq.) of this title for all purposes . . . .

(Emphasis added.)  This explicit cross reference to Chapter 3.1 (Code § 20-49.1 et seq.) requires that the assisted conception statute be read in conjunction with Code § 20-49.1 in the circumstances presented in this case.

Mason's argument is grounded in two provisions of the assisted conception statute, Code §§ 20-157 and 20-158(A)(3). We will consider these provisions in reverse order.

Code § 20-158(A)(3) provides that "[a] donor is not the parent of a child conceived through assisted conception, unless the donor is the husband of the gestational mother."  It is

undisputed that Breit was a "donor" in an assisted conception, and that Breit was never married to Mason. Thus, Mason contends that the statute bars Breit from establishing legal parentage of L.F., regardless of their voluntary written agreement.

Mason argues that Code § 20-49.1, despite being specifically referenced in the assisted conception statute, is not applicable in the present context and therefore their voluntary written agreement is a nullity. First, she contends that Code § 20-49.1 is merely a procedural vehicle by which existing parent-child relationships can be recognized, and that the statute cannot be used to create new parentage rights. We disagree. Code § 20-49.1(B) expressly provides that a parent-child relationship "may be established by" genetic testing or an acknowledgement of paternity:

> The parent and child relationship between a child and a man may be established by:
>
> 1. Scientifically reliable genetic tests, including blood tests, which affirm at least a ninety-eight percent probability of paternity. Such genetic test results shall have the same legal effect as a judgment entered pursuant to § 20-49.8.
>
> 2. A voluntary written statement of the father and mother made under oath acknowledging paternity . . . . The acknowledgement may be rescinded by either party within sixty days from the date on which it was signed . . . . A written statement shall have the same legal effect as a judgment entered pursuant to § 20-49.8 and shall be binding and conclusive unless, in a subsequent judicial proceeding, the

11

> person challenging the statement establishes that the statement resulted from fraud, duress or a material mistake of fact.[4]

Code § 20-49.1 has been amended four times since its enactment, including three times since the enactment of the assisted conception statute.  Yet it has consistently been titled "[h]ow parent and child relationship established."[5] (Emphasis added.) Black's Law Dictionary defines "establish" as "[t]o make or form; to bring about or into existence," a definition that clearly contemplates the creation rather than the mere recognition of parentage rights.  Black's Law Dictionary 626 (9th ed. 2010).

Mason next argues that allowing unmarried sperm donors such as Breit to establish parentage pursuant to Code § 20-49.1(B) directly conflicts with Code § 20-158(A)(3).  Code § 20-49.1(B) contains two independent and disparate provisions: (B)(1) allows paternity to be established unilaterally by scientifically reliable genetic testing, and (B)(2) allows paternity to be established by a voluntary written statement of both biological parents acknowledging paternity.  We must examine these two independent sections separately.

---

[4] Neither Mason nor Breit rescinded the acknowledgement of paternity within sixty days of signing it, and neither party asserted that the agreement resulted from fraud, duress, or a material mistake of fact.

[5] See 1988 Acts chs. 866, 878; 1990 Acts ch. 836; 1992 Acts ch. 516; 1997 Acts ch. 792; 1998 Acts ch. 884.

Preliminarily, Code §§ 20-49.1(B) and 20-158(A)(3) clearly relate to the same subject matter:  establishing legal parentage of children.  As noted previously, Code § 20-49.1 is specifically referenced in the assisted conception statute, of which Code § 20-158(A)(3) is a part.  We must therefore construe these linked statutes that address the same subject matter "so as to avoid repugnance and conflict between them." City of Lynchburg v. English Constr. Co., 277 Va. 574, 584, 675 S.E.2d 197, 202 (2009).  The two statutes must be read "as a consistent and harmonious whole to give effect to the overall statutory scheme."  Bowman v. Concepcion, 283 Va. 552, 563, 722 S.E.2d 260, 266 (2012) (internal quotation marks omitted).  The assisted conception statute specifically indicates that, when applicable, Code § 20-49.1 relates to the determination of parentage of children born as a result of assisted conception. Code § 20-164.  This plain language cannot be ignored.  See English Constr. Co., 277 Va. at 584, 675 S.E.2d at 202 ("No part of an act should be treated as meaningless unless absolutely necessary.").  At the same time, Code § 20-49.1 is only applicable to the extent there is no conflict between its provisions and those of the assisted conception statute.  See Ragan v. Woodcroft Vill. Apts., 255 Va. 322, 325, 497 S.E.2d 740, 742 (1998).

Mason argues that, under Code § 20-49.1(B)(1), donors could manufacture parent-child relationships over the gestational mother's objection through the use of genetic testing. Similarly, a gestational mother who became impregnated by a sperm donor could use Code § 20-49.1(B)(1) to force parental responsibilities on the donor, including the obligation of child support, solely by establishing a biological link. Mason asserts that the General Assembly intended to foreclose such scenarios when it enacted the assisted conception statute. We agree.

Code § 20-49.1(B)(1) directly conflicts with Code § 20-158(A)(3), since it allows paternity to be established solely on the basis of biological ties, which circumvents Code § 20-158(A)(3)'s instruction that mere donors cannot establish parentage. Consequently, a sperm donor aided only by the results of genetic testing may not establish parentage.

Code § 20-49.1(B)(2) does not present such a conflict. Executing an acknowledgement of paternity involves an assumption of rights and responsibilities well beyond biological ties. It is a voluntary agreement to establish an actual parent-child relationship that more closely approximates the status of a gestational mother's husband rather than a third-party donor. The assisted conception statute simply did not contemplate situations where, as here, unmarried donors

14

have long-term relationships as well as biological ties that have been voluntarily acknowledged in writing pursuant to Code § 20-49.1(B)(2), and have voluntarily assumed responsibilities to their children.

As previously discussed, the assisted conception statute was written specifically with married couples in mind.[6] The statute's primary purpose is to protect cohesive family units from claims of third-party intruders who served as mere donors. But Breit is not an intruder. He is the person whom Mason originally intended to be L.F.'s parent, whom she treated as L.F.'s parent for an extended period, and whom she voluntarily acknowledged as L.F.'s parent in a writing that she intended to be legally binding. Until Mason terminated Breit's visitation, Breit cared for, supported, and had begun to establish a parent-child relationship with L.F. Mason and Breit represented the closest thing L.F. had to a "family unit."

We agree with the Court of Appeals that the General Assembly did not intend to divest individuals of the ability to establish parentage solely due to marital status, where, as

---

[6] The definitions listed in the assisted conception statute reiterate the statute's emphasis on married couples. For instance, Code § 20-156 defines "[s]urrogate" as "any adult woman who agrees to bear a child carried for intended parents," and "[i]ntended parents" is defined as "a man and a woman, married to each other, who enter into an agreement with a surrogate under the terms of which they will be the parents of any child born to the surrogate through assisted conception . . . ." (Emphasis added.)

15

here, the biological mother and sperm donor were known to each other, lived together as a couple, jointly assumed rights and responsibilities, and voluntarily executed a statutorily prescribed acknowledgement of paternity.

Having determined that Code § 20-49.1(B)(2) would apply in this context notwithstanding Code § 20-158(A)(3), we turn to Mason's next argument. Mason asserts that Code § 20-157 forecloses a conclusion that Code § 20-49.1(B)(2) applies. Code § 20-157 expressly states that the provisions of Chapter 9 control, without exception, in any related litigation:

> The provisions of this chapter [chapter 9] shall control, without exception, in any action brought in the courts of this Commonwealth to enforce or adjudicate any rights or responsibilities arising under this chapter.

This provision requires this Court to give precedence to Code §§ 20-158(A)(3) and 20-164 when confronted with contrary arguments. However, we must also harmonize Code § 20-49.1, when applicable, due to its explicit inclusion in Code § 20-164. Read in isolation, Code § 20-157 could support Mason's argument. But we do not read statutes in isolation. As stated above, we must construe statutes "to avoid repugnance and conflict between them." City of Lynchburg, 277 Va. at 584, 675 S.E.2d at 202. Likewise, we are bound to construe statutes in a manner that "avoid[s] any conflict with the Constitution." Commonwealth v. Doe, 278 Va. 223, 229, 682 S.E.2d 906, 908

16

(2009).  In Virginia, it is firmly established that "[a]ll actions of the General Assembly are presumed to be constitutional."  Hess v. Snyder Hunt Corp., 240 Va. 49, 52, 392 S.E.2d 817, 820 (1990).  Breit contends that accepting Mason's argument would render the assisted conception statute unconstitutional.  That we cannot do, if there is any reasonable interpretation that conforms to the Constitution. See Ocean View Improvement Corp. v. Norfolk & W. Ry. Co., 205 Va. 949, 955, 140 S.E.2d 700, 704 (1965).  Consequently, we must address Mason's argument regarding Code § 20-157 in the light of two constitutional imperatives.

### C. EQUAL PROTECTION AND DUE PROCESS

Breit argues that if we accept Mason's argument the assisted conception statute violates the Equal Protection Clause of the Fourteenth Amendment.  He suggests that the statute treats unmarried male donors differently than unmarried female donors and treats unmarried donors differently than married donors.

The assisted conception statute does not distinguish between donors based on gender.  The statute defines "[d]onor" as "an individual, other than a surrogate, who contributes the sperm or egg used in assisted conception."  Code § 20-156 (emphasis added).  Thus, a woman who is not the gestational mother also can be a donor.  Neither a male nor a female donor

17

is deemed to be a parent purely as a result of the donation of sperm or egg. See Code § 20-158(A)(3). It is true that an unmarried female egg donor who is also the gestational mother may be considered a parent, see Code § 20-158(A)(1); however, the fact that a male is unable to be the gestational carrier of the fertilized ovum is the result of biology, not discrimination.

Code § 20-158(A)(3) does make distinctions based on marital status: a male donor is afforded rights as a parent only if he is married to the gestational mother. But marital status is not a suspect classification under the Equal Protection Clause. See Eisenstadt v. Baird, 405 U.S. 438, 446-47 (1971). Therefore, disparate treatment of unmarried donors is analyzed to determine whether there is a rational basis for such treatment. "A classification reviewed under a rational basis standard 'is accorded a strong presumption of validity.' " Gray v. Commonwealth, 274 Va. 290, 308, 645 S.E.2d 448, 459 (2007) (quoting Heller v. Doe, 509 U.S. 312, 318-21 (1993)). Such a classification will stand if there is a rational relationship between the disparate treatment and some legitimate governmental purpose. Id.

We have consistently recognized that the Commonwealth has a significant interest in encouraging the institution of marriage. E.g., Cramer v. Commonwealth, 214 Va. 561, 564, 202

18

S.E.2d 911, 914 (1974).  Code § 20-158(A)(3)'s objective of protecting married couples from potential interference by donors is rationally related to that legitimate governmental purpose.  Accordingly, Breit's equal protection argument must fail.

Next, Breit contends that the assisted conception statute, if applied as advanced by Mason without harmonization with Code § 20-49.1 et seq., violates his constitutionally protected right to make decisions concerning the care, custody, and control of his child.  We agree.  That constitutional imperative therefore must guide our conclusion regarding statutory interpretation, particularly regarding Code § 20-157.

The relationship between a parent and child is a constitutionally protected liberty interest under the Due Process Clause of the Fourteenth Amendment.[7]  Troxel v. Granville, 530 U.S. 57, 65 (2000); Wyatt v. McDermott, 283 Va. 685, 692, 725 S.E.2d 555, 558 (2012) ("We recognize the essential value of protecting a parent's right to form a relationship with his or her child."); Copeland, 282 Va. at 198, 715 S.E.2d at 19.  Indeed, the Supreme Court of the United States has characterized a parent's right to raise his or her child as "perhaps the oldest of the fundamental liberty

_____

[7] The due process guarantees of Article I, Section 11 of the Constitution of Virginia are virtually identical to those of the United States Constitution.

19

interests recognized by this Court." Troxel, 530 U.S. at 65. Any statute that seeks to interfere with a parent's fundamental rights survives constitutional scrutiny only if it is narrowly tailored to serve a compelling state interest. McCabe v. Commonwealth, 274 Va. 558, 563, 650 S.E.2d 508, 510 (2007); see also Washington v. Glucksberg, 521 U.S. 702, 721 (1997).

Significantly, in Lehr v. Robertson, 463 U.S. 248 (1983), the Supreme Court of the United States examined the extent to which an unmarried father's relationship with his child is protected under the Due Process Clause. The Court recognized that parental rights do not arise solely from the biological connection between a parent and child. Id. at 261. The Court described the constitutionally protected right of unwed parents as follows:

> When an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the Due Process Clause.

Id. (internal quotation marks and citation omitted).

Prior to his visitation being terminated, Breit demonstrated a full commitment to the responsibilities of parenthood. He was actively participating in L.F.'s life, had agreed to be listed as the father on her birth certificate, had acknowledged paternity under oath, and had jointly agreed with

20

Mason regarding parental rights and responsibilities.  In light of this demonstrated commitment, we conclude that the Due Process Clause protects Breit's fundamental right to make decisions concerning L.F.'s care, custody and control, despite his status as an unmarried donor.[8]

If applied without harmonization with Code § 20-49.1(B)(2), Code §§ 20-157 and 20-158(A)(3) would unconstitutionally infringe on Breit's fundamental parental rights.  As argued by Mason, an unmarried donor could never be

---

[8] Mason argues that Breit's relationship with L.F. is not sufficient to trigger constitutional protection.  She asserts that under the Supreme Court's holding in Michael H. v. Gerald D., 491 U.S. 110, 124 (1989), the existence of constitutionally protected parental rights turns not on the depth of the parent-child relationship, but on whether the type of relationship at issue has traditionally been afforded special protection.  Because assisted conception has only existed in recent years, Mason argues that the relationship between a sperm donor and child could not possibly be a historically protected relationship.

Mason's reliance on Michael H. is misplaced.  In that case, a biological father who spent a short amount of time as the mother's live-in boyfriend sought to establish paternity after the mother had reconciled with her husband.  The Supreme Court refused to recognize a liberty interest on behalf of the boyfriend, holding that relationships between children and adulterous fathers should not be constitutionally protected given society's historical interest in safeguarding the family institution.  Michael H., 491 U.S. at 123-24.  Interference with the family institution is not at issue here: Mason and Breit represent the closest thing L.F. has to a "family unit," as Mason has no husband to claim parentage over Breit.  The Court in Michael H. specifically acknowledged that, although the typical family institution is the marital family, respect has also historically been accorded to relationships developed within households comprised of unmarried parents and their children.  Id. at 124 n.3.

21

the parent of a child conceived through assisted conception. That interpretation would absolutely foreclose any legal means for Breit to establish parentage of L.F., solely by virtue of his status as an unmarried donor. It would prevent Breit from continuing the constitutionally protected relationship he had begun to establish with his infant child. Such a result cannot withstand constitutional scrutiny.

A governmental policy that encourages children to be born into families with married parents is legitimate. In fact, it is laudable and to be encouraged. Yet neither our jurisprudence nor that of the United States Supreme Court permits that policy to overcome the constitutionally protected due process interest of a responsible, involved, unmarried mother or father. See Martin v. Ziherl, 269 Va. 35, 42, 607 S.E.2d 367, 370 (2005). Simply put, there is no compelling reason why a responsible, involved, unmarried, biological parent should never be allowed to establish legal parentage of her or his child born as a result of assisted conception.

When we apply the necessary constitutional due process analysis, the Court of Appeals' harmonization of Code §§ 20-158(A)(3) and 20-49.1(B)(2) must prevail. Code § 20-157 cannot be interpreted to foreclose that conclusion without being rendered unconstitutional. The assisted conception statute, read as a whole, cannot render Code § 20-49.1(B)(2) ineffective

22

because the General Assembly, acting in a manner consistent with its constitutional charge, could not have intended to permanently bar parentage actions by sperm donors under these factual circumstances.[9]  See Hess, 240 Va. at 52, 392 S.E.2d at 820.  Due process requires that unmarried parents such as Breit, who have demonstrated a full commitment to the responsibilities of parenthood, be allowed to enter into voluntary agreements regarding the custody and care of their children.

D. ENFORCEABILITY OF ACKNOWLEDGEMENTS OF PATERNITY

In a final, related argument, Mason contends that acknowledgements of paternity executed pursuant to Code § 20-49.1(B)(2) are unenforceable.  She argues that the rights of children cannot be bartered away by agreement and that all such agreements are void ab initio and of no effect.  As strange as it may seem, the thrust of Mason's argument is that the acknowledgement of paternity impinges on a child's right not to have a parent.

---

[9] On the other hand and as stated previously, Code § 20-49.1(B)(1) directly conflicts with Code § 20-158(A)(3) and may not be applied in the context of assisted conception.  This does not violate constitutional due process rights, however, because Code § 20-49.1(B)(1) contemplates the establishment of paternity solely on the basis of biological ties.  Constitutionally protected rights do not arise merely from the biological connection between a parent and child.  Lehr, 463 U.S. at 261.

Mason relies on this Court's holding in Kelley v. Kelley, 248 Va. 295, 449 S.E.2d 55 (1994). In Kelley, we refused to honor an agreement relieving a divorced father of his child support obligations, holding that "parents cannot contract away their children's rights to support" and that "any contract purporting to do so is facially illegal and void." Id. at 298-99, 449 S.E.2d at 56-57. Mason miscomprehends the breadth of our holding. Kelley only addresses agreements contracting away a child's right to receive support and maintenance. Breit's acknowledgement of paternity provides for the exact opposite – it provides L.F. with a legal avenue to receive support from both parents. Kelley does not prohibit such an agreement.

Furthermore, we reject the notion that children have a purported right or interest in not having a father. To the contrary, Virginia case law makes clear that it is in a child's best interests to have the support and involvement of both a mother and a father, even if they are unmarried. See Copeland, 282 Va. at 194-95, 715 S.E.2d at 17; Wilkerson v. Wilkerson, 214 Va. 395, 397-98, 200 S.E.2d 581, 583 (1973) (recognizing that one parent cannot arbitrarily deprive a child of a relationship with the other parent); see also June Carbone, Which Ties Bind? Redefining the Parent-Child Relationship in an Age of Genetic Certainty, 11 Wm. & Mary Bill Rts. J. 1011,

1023-24 (2003) (discussing children's interests in the continuing involvement of both parents in the child's life).

Although our analysis in this case rests on Breit's constitutionally protected rights as a parent, we recognize that children also have a liberty interest in establishing relationships with their parents. Commonwealth ex rel. Gray v. Johnson, 7 Va. App. 614, 622, 376 S.E.2d 787, 791 (1989). Consequently, it is incumbent on courts to see that the best interests of a child prevail, particularly when one parent intends to deprive the child of a relationship with the other parent. "The preservation of the family, and in particular the parent-child relationship, is an important goal for not only the parents but also government itself . . . . Statutes terminating the legal relationship between [a] parent and child should be interpreted consistently with the governmental objective of preserving, when possible, the parent-child relationship." Weaver v. Roanoke Dep't of Human Res., 220 Va. 921, 926, 265 S.E.2d 692, 695 (1980). Here, L.F. faces a potential loss of liberty in the form of deprivation of a relationship with her biological father, solely because she was conceived through assisted conception by unmarried parents. Virginia's marital preference in assisted conception protects an intact family from intervention from third-party strangers,

but it was not intended to deprive a child of a responsible, involved parent.

### E. CODE § 32.1-257(D)

Finally, Mason argues that Code § 32.1-257(D), a statute intended to control the filing of birth certificates for each live birth in the Commonwealth, bars Breit's ability to establish parentage. When a child is born to unmarried parents, Code § 32.1-257(D) states:

> [T]he name of the father shall not be entered on the certificate of birth without a sworn acknowledgement of paternity, executed subsequent to the birth of the child, of both the mother and of the person to be named as the father.
>
> . . . .
>
> For the purpose of birth registration in the case of a child resulting from assisted conception, pursuant to Chapter 9 (§ 20-156 et seq.) of Title 20, the birth certificate of such child shall contain full information concerning the mother's husband as the father of the child and the gestational mother as the mother of the child. Donors of sperm or ova shall not have any parental rights or duties for any such child.

Our interpretation of this statute is controlled by our analysis of the assisted conception statute. As with the assisted conception statute, we are bound to interpret Code § 32.1-257(D) in a manner that avoids constitutional conflict. Doe, 278 Va. at 229, 682 S.E.2d at 908.

Code § 32.1-257(D) is an administrative, ministerial enactment. Its purpose is to ensure that the Commonwealth's

26

records accurately reflect the <u>intended</u> parent-child relationship.  Where, as here, unmarried biological parents together undertake the process of assisted conception, voluntarily execute an acknowledgement of paternity naming the "donor" as the child's legal father, and together enter into a binding agreement regarding custody and care, prohibiting the "donor" from ever establishing parental rights would be contrary to the statute's stated purpose and contrary to the Due Process Clause of the United States Constitution. Consequently, Mason's argument must fail.

IV. CONCLUSION

For the reasons set forth above, we will affirm the judgment of the Court of Appeals.

Record No. 120158 – <u>Affirmed.</u><br>Record No. 120159 – <u>Affirmed.</u>